# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

————————————

## No. 24-1988

————————————

## UNITED STATES OF AMERICA,
### Appellee

*v.*

## RICHARD EVANS,
### Defendant - Appellant

————————————

## On Appeal from a Judgment of the United States District Court
## for the District of Massachusetts

————————————

## BRIEF OF APPELLANT RICHARD EVANS

————————————

**Michael Pabian**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**pabianlaw38@gmail.com**

**Martin G. Weinberg**
**20 Park Plaza, Suite 1000**
**Boston, Massachusetts 02116**
**(617) 227-3700 (Telephone)**
**(617) 338-9538 (Fax)**
**owlmgw@att.net**

# TABLE OF CONTENTS

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION………………………………………………………...1

STATEMENT OF ISSUES PRESENTED………………………………..1

INTRODUCTION…………………………………………………………2

STATEMENT OF THE CASE……………………………………………4

     Procedural Background…………………………………………...4

     Trial Evidence…………………………………………………….4

     The Evidence Control Unit and Purge Overtime…………………………4

     Collective Bargaining Agreement………………………………...8

     Opinion Evidence…………………………………………………9

     BPD's Receipt of Federal Funds………………………………...20

     Jury Instructions…………………………………………………21

SUMMARY OF ARGUMENT……………………………………………...24

ARGUMENT………………………………………………………...27

I.     THE DISTRICT COURT'S ERRONEOUS WILLFUL BLINDNESS
      INSTRUCTION PREJUDICED EVANS…………………………27

II.    THE EVIDENCE WAS INSUFFICIENT TO SATISFY §666'S
      REQUIREMENT THAT BPD RECEIVE FEDERAL "BENEFITS"……..33

III.   THE DISTRICT COURT COMMITTED PLAIN ERROR IN SEVERAL

i

ASPECTS OF ITS JURY INSTRUCTIONS……………………………38

    A.    Failure to Instruct regarding §666's Federal "Benefits" Requirement…………………………………………………………38

    B.    Contradictory Good-Faith Instruction………………………………40

    C.    Failure to Instruct that Aiding and Abetting Liability Requires "Advance Knowledge" of the Circumstances Constituting the Offense…………………………………………………………………42

IV.   THE DISTRICT COURT COMMITTED PLAIN ERROR BY PERMITTING EXTENSIVE IMPROPER LAY OPINION TESTIMONY……………………………………………………………45

    A.    Improper Legal Conclusions…………………………………………..45

    B.    Speculation regarding Evans's State of Mind………………………50

    C.    Extensive Reliance on Leading Questions…………………………..52

    D.    Other Improper Testimony…………………………………………..54

    E.    The Foregoing Testimony was Independently Inadmissible under Rule 403…………………………………………………………………...55

    F.    The Foregoing Improper Testimony Prejudiced Evans and Impacted the Fairness of the Proceedings…………………………………...56

V.    CUMULATIVE ERROR…………………………………………………..58

CONCLUSION…………………………………………………………...59

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*FAA v. Landy*, 705 F.2d 624 (2d Cir. 1983) .............................................................47

*Fischer v. United States*, 529 U.S. 667 (2000) .................................................. 35, 37

*Hurst v. Florida*, 577 U.S. 92 (2016).......................................................................39

*In re Zofran (Ondansetron) Prod. Liab. Litig.*, 57 F.4th 327 (1st Cir. 2023) .........45

*Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505 (2d Cir. 1977) ...................... 46, 49

*N. Amer. Specialty Ins. Co. v. Myers*, 111 F.3d 1273 (6th Cir. 1997)....................46

*N. Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456 (1st Cir. 1988).......................47

*Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92 (1st Cir. 1997) ..............................45

*Rosemond v. United States*, 572 U.S. 65 (2014)........................................ 26, 42, 44

*Townson v. Wal-Mart Stores, Inc.*, 760 F. App'x 345 (5th Cir. 2019) (unpublished) ......................................................................................................................50

*U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131 (10th Cir. 2009)...............................................................................................47

*United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023)……………………………40

*United States v. Adams*, 740 F.3d 40 (1st Cir. 2014)..............................................27

*United States v. Aguilar*, 80 F.3d 329 (9th Cir. 1996).............................................28

*United States v. Anderskow*, 88 F.3d 245 (3d Cir. 1996) ........................................51

*United States v. Appolon*, 695 F.3d 44 (1st Cir. 2012)..................................... 27, 28

*United States v. Azubike*, 564 F.3d 59 (1st Cir. 2009) ....................................... 27, 29

*United States v. Baptiste*, 8 F.4th 30 (1st Cir. 2021) ................................................58

*United States v. Barnhart*, 979 F.2d 647 (8th Cir. 1992) ........................................33

*United States v. Baskes*, 649 F.2d 471 (7th Cir. 1980) ............................................48

*United States v. Brandon*, 17 F.3d 409 (1st Cir. 1994) ............................... 28, 29, 31

*United States v. Bravo-Fernandez*, 913 F.3d 244 (1st Cir. 2019) .................. *passim*

*United States v. Bray*, 853 F.3d 18 (1st Cir. 2017)...................................................28

*United States v. Brown*, 938 F.2d 1482 (1st Cir. 1991)...........................................50

*United States v. Camuti*, 78 F.3d 738 (1st Cir. 1996)..............................................40

*United States v. Canty*, 37 F.4th 775 (1st Cir. 2022).................................. 38, 40, 58

*United States v. Caraway*, 534 F.3d 1290 (10th Cir. 2008) ....................................59

*United States v. Cavin*, 39 F.3d 1299 (5th Cir. 1994) .............................................41

*United States v. Chen*, 998 F.3d 1 (1st Cir. 2021) ...................................................34

*United States v. Crawford*, 239 F.3d 1086 (9th Cir. 2001) .....................................46

*United States v. Dockray*, 943 F.2d 152 (1st Cir. 1991)................................... 40, 41

*United States v. Dubon-Otero*, 292 F.3d 1 (1st Cir. 2002)......................................39

*United States v. Encarnacion-Ruiz*, 787 F.3d 581 (1st Cir. 2015) .........................42

*United States v. Epstein*, 426 F.3d 431 (1st Cir. 2005) ...........................................31

*United States v. Falcon-Nieves*, 79 F.4th 116 (1st Cir. 2023).......................... 33, 34

*United States v. Fernandez-Jorge*, 894 F.3d 36 (1st Cir. 2018)....................... 42, 44

*United States v. Ford*, 821 F.3d 63 (1st Cir. 2016) .......................................... 27, 42

*United States v. Greaux-Gomez*, 52 F.4th 426 (1st Cir. 2022)...............................53

*United States v. Henke*, 222 F.3d 633 (9th Cir. 2000)..........................................51

*United States v. Latorre-Cacho*, 874 F.3d 299 (1st Cir. 2017) ....................... 38, 41

*United States v. Little*, 829 F.3d 1177 (10th Cir. 2016)................................... 29, 33

*United States v. McLean*, 802 F.3d 1228 (11th Cir. 2015)....................................39

*United States v. McLellan*, 959 F.3d 442 (1st Cir. 2020) ......................................33

*United States v. Mikutowicz*, 365 F.3d 65 (1st Cir. 2004) .....................................45

*United States v. Newman*, 49 F.3d 1 (1st Cir. 1995) .............................................46

*United States v. Padilla-Galarza*, 990 F.3d 60 (1st Cir. 2021) .............................59

*United States v. Pereira*, 848 F.3d 17 (1st Cir. 2017) ...........................................59

*United States v. Prado*, 815 F.3d 93 (2d Cir. 2016) .............................................43

*United States v. Randazzo*, 80 F.3d 623 (1st Cir. 1996)........................................22

*United States v. Richardson*, 14 F.3d 666 (1st Cir. 1994) .....................................31

*United States v. Rivera-Ortiz*, 14 F.4th 91 (1st Cir. 2021) ....................................34

*United States v. Serrano-Delgado*, 29 F.4th 16 (1st Cir. 2022) ............................22

*United States v. Sotis*, 89 F.4th 862 (11th Cir. 2023) ...........................................50

*United States v. Southers*, 583 F.2d 1302 (5th Cir. 1978).....................................48

*United States v. Sullivan*, 118 F.4th 170 (2d Cir. 2024)........................................39

v

*United States v. Vazquez-Rivera*, 665 F.3d 351 (1st Cir. 2011) ...................... 45, 51

*United States v. Walker*, 665 F.3d 212 (1st Cir. 2011) ............................................50

*United States v. Wantuch*, 525 F.3d 505 (7th Cir. 2008) ..................... 48, 49, 50, 55

*United States v. Wiggan*, 700 F.3d 1204 (9th Cir. 2012) .........................................55

*United States v. Williams*, 827 F.3d 1134 (D.C. Cir. 2016) ....................................51

## Statutes

18 U.S.C. §1343 .................................................................................................4, 32

18 U.S.C. §666 ................................................................................................. *passim*

## Rules

Fed. R. Evid. 403 ......................................................................................... 55, 56

Fed. R. Evid. 611 .................................................................................................52

Fed. R. Evid. 701 .......................................................................................... *passim*

Fed. R. Evid. 704 .................................................................................................56

### Note on Citations to the Record

Material contained in the Addendum to the Brief is cited as "Add:____."

Material contained in the Appendix is cited in the Brief as "App:_____."

vi

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal arises from a judgment of the district court entered on October 25, 2024, Add:1; Evans's notice of appeal was filed that same day.  App:1210. The district court had jurisdiction under 18 U.S.C. §3231.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF ISSUES PRESENTED

1.      Whether the district court erroneously gave a willful blindness instruction.

2.      Whether the evidence was sufficient to satisfy §666's requirement that the Boston Police Department receive more than $10,000 in federal benefits during the relevant one-year period.

3.      Whether the district court plainly erred in instructing the jury regarding (a) §666's federal benefits requirement, (b) Evans's good-faith defense, and/or (c) aiding and abetting liability.

4.      Whether the government's reliance on inadmissible lay opinion testimony requires Evans's convictions to be vacated.

5.      Whether Evans's convictions must be vacated under the doctrine of cumulative error.

1

## INTRODUCTION

This prosecution of Captain Richard Evans, a more than 30-year veteran of the Boston Police Department ("BPD"), arose from an undisputedly long-standing and pervasive practice of the BPD in submitting overtime in four-hour blocks, rather than by the actual time worked. The case focused on so-called "purge" overtime in the Evidence Control Unit ("ECU"), which involved officers working overtime and reviewing old evidence for possible disposal to free-up room in the warehouse for intake of new evidence. This purge overtime, and the submission of time in four-hour blocks, began before Evans was transferred to the ECU when a practice of submitting overtime in four-hour blocks was implemented by prior captain Thomas Dowd. Evans inherited this routine and practice, did not change it, and at trial argued it was permitted under the applicable Collective Bargaining Agreement ("CBA") and consistent with the well-known prior practices of the BPD. The evidence also showed that the practice continued after Evans's tenure in the ECU ended under Lieutenant Timothy Torigian.[1]

The government, in an apparent effort to pre-empt the defense which focused on Evans's good faith in believing the practice was both lawful and in

---

[1] Torigian and several of his subordinates had previously been acquitted by a jury after raising a defense based in large part on the CBA.

conformity with the CBA and BPD's prior practices, elicited extensive opinion testimony from lay witnesses. The witnesses testified to their legal conclusion: (1) that purge overtime was required to be submitted on an hour-for-hour basis, not in four-hour blocks under the CBA; (2) that Evans's alleged conduct violated BPD regulations; and (3) that submission of overtime in four-hour blocks constituted "theft" and "stealing." Despite Evans's doing no more than adopting an ongoing practice that the evidence shows was never to his knowledge criticized or objected-to, the district court gave a willful blindness instruction that prejudiced Evans's defense that he had no knowledge that the practice was not legitimized by the CBA and consistent with BPD's prior practices.

Additionally, the district court committed several clear instructional errors: (1) omission of any requirement that the BPD received federal "benefits" (the trial evidence was, moreover, insufficient for a reasonable jury to find that element satisfied); (2) a contradictory good-faith instruction; and (3) omission of the requirement that a defendant charged under an aiding and abetting theory have advance knowledge of the circumstances constituting the offense.

The foregoing errors deprived Evans of the fair trial to which he was entitled and require that all his convictions be vacated.

3

## STATEMENT OF THE CASE

### Procedural Background

Evans was indicted and charged with (1) federal programs theft, in violation of 18 U.S.C. §666, and conspiracy to commit and aiding and abetting same; and (2) wire fraud, in violation of 18 U.S.C. §1343, and conspiracy to commit and aiding and abetting same. *See* App:19. The case was tried in March 2024. The jury convicted Evans on all counts. *See* App:1208-09. On October 24, 2024, Evans was sentenced to an incarcerative term of one year and one day.

### Trial Evidence

### The Evidence Control Unit and Purge Overtime

Evans was transferred to the ECU effective May 19, 2012. *See* App:160-61. He was transferred out of that unit around April 2, 2016. *See* App:161. The ECU was responsible for managing the evidence warehouse, as well as "the in-taking of evidence" and "making sure that evidence was delivered to courts." App:344-45.

The warehouse "was overwhelmed with decades worth of antiquated evidence." App:344. Accordingly, "[s]ometime in 2011," before Evans's arrival at the ECU, BPD embarked on an effort "to clean out the building." App:345. Edward Callahan, Chief of BPD's Bureau of Administration and Technology, and

Superintendent Dan Linskey "set up what ultimately became known as the purge project where [BPD] would have officers work in the evening hours in an attempt to begin the clean out of the building." App:346. "[F]ollowing the conclusion of each work shift four days a week, the officers were authorized to earn up to four hours overtime . . . to get the clean-up underway." App:346. The purge overtime program began under Captain Thomas Dowd and continued during Evans's tenure as captain. *See* App:348. Officers would review "old evidence" to determine whether there was still a "need for it," and, if not, dispose of the evidence. App:460.

It was decided at a meeting led by two sergeants that, as long as each officer reviewed 20 cases for potential disposal of evidence, "officers could split" the 4:00 to 8:00 p.m. shift, meaning two officers would work 4:00 to 6:00 and two 6:00 to 8:00. App:221-22. Under this shift splitting procedure, all officers were paid for four hours of overtime each, despite only working two. *See* App:228.

As time went by, the officers began starting their overtime shifts all together at 4:00 p.m. more often. *See* App:235. One officer assigned to the ECU testified that this resulted from the introduction of a "new evidence tracker system." App:479. "[S]ome people got the system quicker than others," so "people stayed

to assist others and tried to learn the system." App:479.  In those instances, they would typically be relieved before 8:00 p.m., but all officers would list their hours as 4:00 to 8:00 p.m. on their overtime slips.  *See* App:235, 480-81.

Multiple witnesses testified that the ECU warehouse was equipped with an alarm system.  *See, e.g.*, App:281-82.  The system included motion detectors inside the building, so, once the alarm was set, no one could be in the building without setting it off.  *See* App:284.  Alarm records introduced at trial showed that Evans and his subordinates had often billed four hours of overtime on days when the warehouse was closed before 8:00 p.m.  *See infra* pages 17-18.

The overtime schedule was posted on a community board in the warehouse.  *See* App:271.  The overtime opportunity was voluntary, and officers had the ability to refuse an assignment.  *See* App:272.

The submission of purge overtime in four-hour blocks began before Evans's tenure at the ECU and continued after it.  *See* App:507.  In the vast majority of Evans's purge overtime submissions, he listed his start time as 16:00, end time as 20:00, and "Actual Hours Worked" as 4:00.  App:858-1196.  There was evidence that, on some occasions, Evans and those working underneath him submitted overtime slips for purge reflecting less than four hours.  *See* App:604-06.  In those

6

instances, payroll records reflected payment corresponding to the hours listed on the slips. *See* App:604-06.

Callahan, Chief of BPD's Bureau of Administration and Technology, testified that he approved purge overtime with the understanding that "it would be paid for on an-hour-by-hour basis," but he could not recall discussing that understanding with his captains. App:347. Callahan "never gave it much thought quite frankly." App:347-48. He testified on cross-examination that he was aware of "the existence" of the CBA and had only a "[v]ery limited" awareness of the sections "dealing with overtime and compensation of officers." App:396-97. Two officers working under Evans testified to their understanding that purge overtime was paid on an hour-for-hour basis. *See* App:245, 467-68.

Diana Lopez, a former officer assigned to the ECU, testified that she submitted her time for purge overtime in four-hour blocks before, during, and after Evans's tenure. *See* App:637. Lopez testified that, in doing so, she had no "intention to steal." App:638. Lopez pled guilty to crimes because that was "what [she] had to do" to avoid prison and remain with her children. App:640-41. Tracy McHale-Araica, another former ECU officer, similarly testified that it was a "custom and practice under Dowd" to submit overtime in four-hour blocks, which

7

continued under Evans's command.  App:669.  McHale-Araica explained, "I never

really thought about it.  It was just the standard practice of what we did."  App:670.

### Collective Bargaining Agreement

The CBA for uniformed sergeants, lieutenants, and captains, including

Evans, at the relevant time provided: "If duty requires an employee to work

beyond the normal quitting time of his scheduled tour of duty . . . [i]f an employee

works more than thirty . . . minutes of such service, such overtime service shall be

rounded off (and paid for) to the next quarter hour."  App:812 (Section 3).  This is

the only reference in the CBA to overtime paid hour-for-hour in 15-minute

increments.

A separate section of the CBA, Section 2, provided that "[e]mployees other

than those required to work beyond their normal tour of duty due to the exigencies

of their workday (such as a late investigation, etc.) shall have the option of

declining offered overtime . . . ."  App:811.  The CBA referred to this circumstance

as "voluntary overtime."  App:811.  Such overtime was required to be "distributed

on a fair and equitable basis," with "a record of acceptances and refusals . . . posted

weekly."  App:811.

Yet another portion of the CBA provided that "[i]f an employee who has left

his place of employment or last duty assignment after having completed work on his regular tour of duty is recalled . . . , or if an employee is so recalled on a scheduled day off or during his vacation, he shall be paid on an overtime basis for all such time and shall be guaranteed a minimum of four . . . hours of overtime recall pay." App:812. The CBA similarly provided that "[c]ourt time shall be four (4) hours minimum at the overtime rate." App:820.

The CBA contained no specific reference whatsoever to purge overtime. *See* App:195.

### Opinion Evidence

The government's first trial witness was Frank Mancini, a retired BPD superintendent. The government asked Mancini, who was not disclosed as an expert pursuant to Fed. R. Evid. 702, to opine on a variety of topics, including requirements relating to overtime. The government asked Mancini, who again had no proffered expertise regarding contract interpretation or the CBA specifically, "By default, how is overtime accrued? Or what units of time are used to measure how much overtime is performed?" App:131-32. Mancini responded, "I believe in the [CBA] it states in 15-minute increments . . . of any amount of time past your normal quitting time." App:132; *see also* App:141 (asking Mancini to "tell us in

plain English" what the relevant portion of the CBA meant).  The government later asked Mancini whether, "section 3" of the CBA, which provides for overtime paid in 15-minute increments, applied "to voluntary overtime."  App:146.  Mancini said, "Yes."  App:146.  Later in the examination, the government addressed the concept of shift splitting, asking Mancini whether, if two officers who split a shift "both wrote down eight hours of service on their overtime slips," that would "be permissible or impermissible under [BPD] regulations."  App:175.  When Mancini answered that it would be impermissible, the government asked him to elaborate. Mancini said, "That would be a violation of the rule [requiring] accurate reporting of overtime, also the rule of fulfilling the entirety of your shift and the reporting of accurate hours worked on your overtime and detail cards."  App:175.

The government also inquired regarding "overtime theft."  Mancini, when asked to define that term, testified, "my understanding is submitting fraudulent overtime requests for payment for hours that were not worked."  App:148.  The government then asked, "under what circumstances were" instances of suspected overtime theft "handled as criminal investigations" and "[w]hat markers . . . indicated that they were criminal in nature."  App:149.  Mancini responded, "Typically, of course, the submitted overtime slips request for payment did not

10

reflect the results of the investigation indicating that they were the actual hours worked by the individuals submitting those slips." App:149. The government proceeded to inquire about entirely unrelated investigations of other BPD personnel relating to overtime issues. *See* App:151; *see also* App:769-97 (compilation of resulting "Personnel Order[s]" from 1999 to 2015).

Finally, the government showed Mancini a series of emails. It acknowledged at the outset that Mancini was "not a party to any of the[] e-mail[s]," but nonetheless asked him "to read some of them aloud and to translate some of the terms based on [his] experience." App:164. The government proceeded to ask Mancini, based on an email having nothing at all to do with the events in issue (and instead relating to a rule limiting officer details at bars and nightclubs) whether Evans was "knowledgeable about BPD's rules and regulations . . . governing details." App:165. The government generally asked Mancini to speculate regarding Evans's state of mind and what he meant in various messages, despite the lack of evidence that Mancini had discussed any such messages with Evans. *See* App:167 ("[T]his e-mail is Captain Richard Evans directing people to make sure that they have the correct start and end time even though they will get paid a four-hour minimum for those court appearances?"), 169 ("[I]s it fair to say

that Captain Evans had a question about how overtime should be handled within

the Court Unit?"), 170 ("[D]oes it appear in summary that Richard Evans is asking

about details about how purge overtime works the same week he started at the

[ECU]?"), 176 ("Mr. Evans refers to the OT scamming scandal with the state

police.  Based on your experience and your knowledge and the service in the BPD,

what do you believe he's referring to?"), 177 ("[L]et me direct your attention to

what Mr. Evans says about time management issues.  What is he asking the

recipients to do in terms of time management issues?"), 177 ("[I]n the last

sentence, Richard Evans says that the department is looking at that issue as well, so

make sure everyone is aware of this.  What do you understand him to be saying?").

     The government next called Margaret Waggett, a former BPD patrol officer.

She, like Mancini, was asked to opine on the propriety of Evans's alleged conduct.

*See* App:223 ("[I]s splitting a shift permitted under BPD rules and regulations?"),

277 ("[D]o you believe that lying on forms, leaving early, getting paid for work

that you didn't do, would you say that was a good culture or a bad culture?").

Waggett testified that she "assumed [Evans] knew" about the overtime practices

despite "never" having "had a discussion with him about it."  App:232.

     Another officer, Joseph Nee, was similarly asked, "When you were working

two hours and putting in four hours, was that the truth or not?"  App:474; *see also*
App:477 ("Do you have any reason to believe the split shift in this way, working
half the time and getting paid twice for the amount of work you're actually doing,
is allowed by the [BPD]?"), 478 (Q: "What do you call it when you get money that
you're not entitled to get?"  A: "Stealing."), 487 ("At any point when you're
putting in for hours not actually worked and getting more money than you're
entitled to, would you view that as theft?").  The government also asked Nee, like
Waggett, to speculate regarding Evans's state of mind.  *See* App:511 ("Could you
have gotten away with splitting your shifts and only working half the time if the
supervisors didn't know it? . . . Similarly, when by 2015 and certainly the last year
or so of Captain Evans' tenure when people are consistently leaving early . . .
could you have gotten away with that if the supervisors also weren't in on it?").

Ellen Coppola worked in BPD's payroll department.  There was no evidence
that Coppola had ever worked, much less supervised, overtime.  Nonetheless, she
was asked by the government to define "extended shift or tour."  App:309.  She
described it as "[a]nything that takes place immediately following your tour of
duty."  App:309.  Such overtime was designated by a three-digit code on the
overtime form beginning with 3 and was paid based on "actual hours worked, but

13

within 15 minutes." App:312.  The government proceeded to pose a series of

hypotheticals, asking Coppola if, "[a]t the end of the 7:30 a.m. to 4:00 p.m. shift,

someone works from 4:00 to 5:00 p.m.," what "category" of overtime that would

be.  App:314.  Coppola responded, "That would be an extended tour," and the

employee would be paid for one hour.  App:315.  After some further hypotheticals,

the government summarized, "And so is it your general understanding that if

overtime comes at the end of a shift, it's paid in these 15-minute intervals?  And if

it does not, if you're re-called or if there's some other exception, then there's a

four-hour minimum; is that correct?"  App:315-16.  Coppola agreed.

The government then showed Coppola a compilation of overtime slips

asking whether they reflected "[h]undreds and hundreds of occasions where

[Evans] filled out the slip, he picked the overtime category, he signed it, he

reported hours and actual hours worked."  App:320.  Pointing to one example, the

government asked, "So [in] this instance *Captain Richard Evans himself is saying*

this is additional work and he, himself, is saying this is a 300 code that is paid on

an extended tour 15-minute interval basis, correct?"  App:321 (emphasis added).

Coppola responded affirmatively.  She later confirmed that "this goes on hundreds

of times" and "all of these 300 codes are all extended tours, all paid in 15-minute

intervals." App:323. The government asked whether the classification of overtime as "voluntary or not voluntary" affected the amount of an overtime payment. App:331. Coppola responded, "Ordered and not ordered, it's the same overtime codes . . . either way." App:331.

The government asked Callahan "what knowledge . . . captains have about overtime." App:348. Callahan responded, "I think they would have had pretty intensive knowledge given the fact that . . . captains are the highest . . . civil service ranked employees in the department. There are districts working in police activities most of their careers, so I think they would have understood that." App:348. The government similarly asked, "because the [overtime] slip said 'start time', 'end time', 'actual hours worked', did you assume that captains . . . knew that they had to write their accurate hours?" App:351. Callahan responded affirmatively.

The government asked whether it would "have been proper to bill for four hours of purge overtime if [the officers] were working less." App:349. Callahan answered, "No." App:349. Similarly, the government asked, "if Captain Dowd started a practice of everyone leaving early, only working two hours and then putting in for a four-hour shift, would that have been right or wrong?" App:377.

15

Callahan said, "That would have been wrong."  App:377.  The government

followed-up, "If Captain Evans continued that practice that was started by Captain

Dowd, would that have been right or wrong?"  App:377.  Callahan gave the same

answer.  *See also* App:438 (Q: "[I]f there was a shift of four hours from . . . 4:00 to

8:00, and one employee worked from 4:00 to 6:00 and the second employee

worked from 6:00 to 8:00 but both employees wrote down that they worked from

4:00 to 8:00, would that be a false or a true time slip?"  A: "It would be a false time

slip."  Q: "And would that be right or wrong?"  A: "That would be wrong.").  The

government showed Callahan a chart reflecting "overtime hours that were paid

while the evidence warehouse was closed" according to alarm data.  App:386.  It

posed a series of leading questions to Callahan on the subject.  *See, e.g.*, App:386

("And do you see for June 24, 2015, . . . Captain Evans submitted overtime from

4:00 p.m. to 8:00 p.m. . . .  And several other officers do, too. . . .  And do you see

that of those fo[u]r hours of overtime they submitted, approximately two hours of

those overtime hours were billed while the entire evidence warehouse was

closed."), 386-87 ("And is that consistent with the message from Richard Evans

that everything is taking twice or three times as long; purge will be slowing down

dramatically because of the evidence tracking system?"), 387 ("Now, looking at

16

these overtime slips, do you see that virtually all of them were from 4:00 to 8:00 p.m.?").

Wayne Lanchester testified that he became captain of the ECU in February 2019, about three years after Evans had left. *See* App:515. The government asked him to "help the jury understand the categories of overtime in the [BPD]." App:528. Lanchester testified that "the series 3 are when you're working past the tour that you were either scheduled to work or overtime working." App:528. Lanchester proceeded to define "extended tour overtime" as "any overtime where you work past . . . your scheduled tour that you were working." App:529.

The government's final witness was Matthew Iannetti, an FBI forensic accountant. Iannetti testified that he compared payroll data regarding ECU overtime to records reflecting the alarm activity for the relevant timeframe showing when the warehouse was closed. *See* App:575-76. The government proceeded to lead Iannetti through the summary charts he created in a manner reminiscent of closing argument. *See, e.g.*, App:579 ("[Y]our analysis for . . . 5/23 for Richard Evans showed that the building was shut down 38 minutes before and you round that up to 15 minutes, and three-and-a-half hours is what you think he should have been paid even if he was there the whole time?"), 585 ("Do you

17

observe a pattern where then consistently day after day after day the building is getting shut down hours early? . . . And so in June through July, there isn't a single time period when the building is shut down during, near or at eight o'clock, correct?"), 586 ("[A]ll through August and September, time after time you see Captain Evans and others under his command putting in for four hours actually worked? . . . When the alarm data day after day is showing the building being closed two hours, three hours, two hours, two-and-a-half hours, every day?"), 587 ("[T]here's not a single day here where it's even within an hour of the actual hours that people are submitting, correct?"), 594 ("[E]ven if you credit someone all of the time and all of the overtime pay for every minute the building was even open, . . . Evans was paid at least $17,000 when the building wasn't even open? . . . And even if you credit members of his team at ECU for every minute, even if half are leaving early, even if they're splitting shifts, even if they're not working, even if you give them every benefit during the period of the conspiracy, there's over $400,000 paid . . . to members of the ECU when the building is not even open?"), 598 ("[Y]ou saw hundreds of shifts where . . . Captain Evans submitted claims saying he actually worked for four hours; is that correct?").

Iannetti was also asked to speculate regarding Evans's state of mind based

on payroll records.  *See, e.g.*, App:598 ("Did you find examples where Captain
Evans **knew** how to put in less than four hours?" (emphasis added)), 600 ("So are
these examples that if there's a four-hour minimum, he **knows** to put in less than
four hours?" (emphasis added)), 609 ("[T]here are hundreds of examples,
including periods before and after he's in ECU, where [Evans] **knows** how to put
in more or less than four hours, correct?" (emphasis added)).

 The government additionally asked Mancini to testify repeatedly regarding
officer truthfulness.  *See* App:125-26 (Q: "Why is it important for police officers to
be truthful?"  A: "Well, one important reason is that we need the trust of the public
in order to implement the community policing philosophy.  Secondarily, it's
extremely important for purposes of testifying in court that police officers have no
history of untruthfulness, have not been sustained in any . . . internal affairs
investigations[] for being untruthful, because it would impact their status within
the Brady Rule or Giglio issues that in court cases might undermine their ability to
testify effectively in court."), 126 (asking whether BPD rule regarding truthfulness
of "reports" applied only "to police reports" or included "other reports submitted
by police officers," specifically "time sheets and overtime slips"), 128 (Q: "[C]an
you summarize in general . . . what's the importance of public integrity to the

19

police department?"  A: "I think it goes to the foundational principles of policing

in a democratic society.  Integrity is essential in order to gain the trust of the public

with police officers in order to have a functioning and legitimate democracy."),

129 ("[D]o BPD's regulations about integrity and truthfulness apply to

timekeeping and overtime violations?").

### BPD's Receipt of Federal Funds

Lisa O'Brien, BPD's former finance director, testified that, "between the

years of 2012 to 2019," BPD received "more than $10,000 in federal funds each

year."  App:547.  That included the "one-year period from April 2015 to March

2016" charged in the substantive §666 count of indictment.  App:557.  The only

evidence of a grant received within that time was described as being for "JAG

equipment" in the amount of $28,202.81, but with no explanation provided as to

why the money was furnished or what it was used for.  App:557-58.  The

supporting exhibit added no meaningful detail regarding BPD's receipt or

expenditure of the money, merely describing the funding as "FFY15 JAG

Equipment Grant."  App:1202.

O'Brien testified about two other grants that were not tied to the charged

one-year time period.  First, BPD received a "Community-based Violence

Prevention Grant" of $2.8 million between October 1, 2015 and December 31, 2017.  App:549-50, 1197.  O'Brien also mentioned a "Violence Against Women" grant that "basically supports the salary and fringe and any overtime for domestic violence advocates."  App:556.  An exhibit showed that the grant was received between October 1, 2015 and December 31, 2016, in the amount of $45,811.53.  App:1206. The government made no attempt to elicit a factual predicate for the statutory requirement that any federal funds received by the BPD constituted "benefits," 18 U.S.C. §666(b), or to fit either of the two grants at issue into the charged one-year time period.

### Jury Instructions

After the close of evidence, the district court judge informed the parties that it intended to instruct the jury on "good faith," which it described as "a complete defense to an allegation of willful conduct."  App:659.  Ultimately, the court instructed the jury:

> Since an essential element of the crime of conspiracy is the intent to commit the underlying crime, it follows that good faith on the part of Mr. Evans is a legitimate defense.  If you find that Mr. Evans believed in good faith that he was acting properly, even if he were mistaken in that belief, and even if others were injured by his conduct, there would be no crime. . . .  Keep in mind that, while a defendant's honest belief that his actions

21

were proper may negate an intent to commit the crime of conspiracy. However, a good faith belief that a potential victim will ultimately sustain no harm is not a defense. ***Nor will good faith negate a defendant's intent to deceive or defraud others***.

App:751-52 (emphasis added); *see also* App:759 (referencing these instructions in context of wire fraud).

The district court, over objection,[2] gave the following willful blindness instruction:

> In deciding whether the defendant acted knowingly, you may infer that the defendant had knowledge of the fact if you find that he deliberately closed his eyes to a fact that

---

[2] Prior to closing arguments, Evans's counsel asked the district court, "just for the record, respectfully, can I take an objection to the willful blindness addition" to the instructions? App:694. The court responded, "Yeah. And let's renew that when I finish the instructions." App:694. The district judge did not request any additional information regarding the basis for the objection because, in context, the basis was clear: that the trial evidence did not support the provision of a willful blindness instruction under the well-established test that has been in place for decades. *See infra* Section I. After the court instructed the jury, it prompted Evans's counsel, "you wanted to preserve your --." App:763. Counsel then renewed the willful blindness objection (the transcript reads "willful, blameless," but the objection could not reasonably be understood to refer to anything other than Evans's willful blindness objection). App:763. Because the district court "understood the thrust of [Evans's] objection," the issue is preserved for appeal. *United States v. Randazzo*, 80 F.3d 623, 632 (1st Cir. 1996); *see also United States v. Serrano-Delgado*, 29 F.4th 16, 25 (1st Cir. 2022) (acknowledging that this Court's precedent "deem[ing] objections to jury instructions automatically unpreserved unless made after the instructions are given and before the jury retires" is an "outlier" which has "recently elicited significant criticism from several members of th[e] court" and need not be "expand[ed]" or "construe[d] . . . broadly").

> otherwise . . . would have been obvious to him. To infer
> willful blindness, you must find that two things have
> been established. First, that the defendant was aware of
> [a] high probability of the fact in question. And, second,
> that the defendant consciously and deliberately avoided
> learning of that fact. However, mere negligence or
> mistake in failing to learn the fact is not sufficient. There
> must be a deliberate effort to remain ignorant of the fact.

App:755.

With respect to the federal programs theft charges, the court instructed that

the government must prove, among other things, "[t]hat during the one-year period

beginning March 1, 2015, the [BPD] was the recipient of federal grants of funds in

excess of $10,000." App:753. It later clarified, "While the government must

prove that the [BPD] received federal funds in the excess of $10,000 in the year

alleged, the government is not required to prove a connection between the federal

funds and the alleged criminal activity." App:754.

The district court instructed the jury regarding aiding and abetting liability,

which provided an alternative basis for conviction on all substantive counts. It

explained:

> To aid and abet means intentionally to help someone else
> to commit a crime. To establish aiding and abetting, the
> government must prove beyond a reasonable doubt that
> someone else committed the charged crime, and that the
> defendant willfully associated himself in some way with

23

the crime and willfully participated in it as he would in
something he wished to bring about.  This means that the
government must prove that the defendant consciously
shared the other person's knowledge of the underlying
criminal act and intended to help him or her.  The
defendant need not perform the underlying criminal act,
be present when it is performed, or be aware of the
details of its execution to be guilty of aiding and abetting.
But a general suspicion that an unlawful act may occur or
that something criminal is happening is not enough.
Mere presence at the scene of a crime and knowledge
that a crime is being committed are also not sufficient to
establish aiding and abetting.

App:755-56.

## SUMMARY OF ARGUMENT

I.  The district court erroneously gave a willful blindness instruction, despite

the utter absence of evidence that Evans deliberately avoided learning any relevant

facts.  Evans could not (and did not) claim a lack of knowledge with respect to his

own overtime submissions.  And the government expressly proceeded on the

theory that Evans had actual knowledge of his subordinates' fraud that he was

accused of aiding and abetting.  Evans's mere failure to question the consistent

overtime practices that he knew existed in the ECU before and which continued

after his tenure did not constitute the deliberate avoidance necessary to justify the

provision of a willful blindness instruction. The erroneous instruction created an

unwarranted risk that the jury would convict Evans for failing to stop illegal conduct by his subordinates, thus undermining the statutory requirements that he act intentionally to defraud.

II.  The evidence was insufficient to satisfy §666's requirement that the BPD received $10,000 in federal "benefits" annually.  In direct contravention of this Court's opinion in *United States v. Bravo-Fernandez*, 913 F.3d 244, 251 (1st Cir. 2019) (citation omitted), the government introduced evidence that the BPD received federal "funds," without offering sufficient evidence regarding the "structure, operation, and purpose" of the relevant federal program(s), which is necessary "to make ascertainable whether an entity received 'benefits,'" as required by statute, nor as to certain federal funds did it prove that the receipt of any that could be "benefits" was within the one-year period of Count 2.

III. The district court plainly erred in its instructions to the jury, including by: (A) stating that §666 required only evidence that BPD received federal "funds," ignoring altogether this Court's analysis of the "benefits" element in *Bravo-Fernandez*; (B) providing a good-faith instruction that was both contradictory and improperly framed acquittal as permissive rather than mandatory upon a finding of good faith; and (C) failing to mention, much less, explain, the "advance

knowledge" requirement for aiding and abetting liability as articulated by the

Supreme Court in *Rosemond v. United States*, 572 U.S. 65, 77-78 (2014).

IV.     The district court plainly erred in permitting the government to offer

extensive improper lay opinion testimony, including (A) legal conclusions

interpreting the CBA and BPD regulations in a manner strongly suggesting that

Evans violated them, as well as characterizing Evans's alleged conduct in criminal-

law terms such as "stealing" and "theft"; (B) speculation regarding Evans's state of

mind with no foundation that the witnesses had ever discussed the relevant

overtime practices with Evans; and (C) heavy reliance on leading questions in

direct-examination of the government's own witnesses and with no apparent need.

The foregoing testimony affected Evans's substantial rights by offering improper

support for a theory of prosecution that another jury had squarely rejected in

acquitting Evans's successor as captain of the ECU on similar charges.

V. Even if the Court finds that none of the foregoing errors, standing alone,

warrants vacating Evans's convictions, those convictions must be vacated under

the cumulative error doctrine.

## ARGUMENT

## I.    THE DISTRICT COURT'S ERRONEOUS WILLFUL BLINDNESS INSTRUCTION PREJUDICED EVANS

This Court has "not definitively resolved what standard of review [applies] to the district court's decision to give a willful blindness instruction, and [has] oscillated between de novo and deferential standards of review." *United States v. Appolon*, 695 F.3d 44, 63 (1st Cir. 2012) (citations omitted). Because the Court generally "review[s] a district court's construction of law de novo and its choice of language and emphasis for abuse of discretion," *United States v. Adams*, 740 F.3d 40, 45 (1st Cir. 2014), the defense contends that the *de novo* standard is more appropriate to a claim (like the present one) that the evidence did not support the giving of a willful blindness instruction at all.

A willful blindness instruction is only appropriate if, *inter alia*, "(1) a defendant claims a lack of knowledge, [and] (2) the facts suggest a conscious course of deliberate ignorance." *United States v. Azubike*, 564 F.3d 59, 66 (1st Cir. 2009). In determining whether the second requirement is satisfied, this Court "consider[s] whether the record evidence reveals 'flags' of suspicion that, uninvestigated, suggest willful blindness." *Id.* (citation omitted); *see also, e.g.*, *United States v. Ford*, 821 F.3d 63, 74 (1st Cir. 2016) ("Evidence sufficient to

27

meet requirement (2) can include evidence that the defendant was confronted with 'red flags' but nevertheless said, 'I don't want to know what they mean.'" (citation omitted)); *Appolon*, 695 F.3d at 57 ("[W]hat is needed are sufficient warning signs that call out for investigation or evidence of deliberate avoidance of knowledge." (citation omitted)); *United States v. Bray*, 853 F.3d 18, 30 (1st Cir. 2017) ("A willful blindness instruction is meant to inform[] jurors that they may impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps." (citation omitted)).  To support a theory of willful blindness, "[i]t is not enough that defendant was mistaken, recklessly disregarded the truth, or negligently failed to inquire.  Instead, the government must present evidence indicating that defendant purposely contrived to avoid learning all of the facts in order to have a defense in the event of subsequent prosecution."  *United States v. Aguilar*, 80 F.3d 329, 332 (9th Cir. 1996) (citation omitted); *see also United States v. Brandon*, 17 F.3d 409, 452 (1st Cir. 1994) (similarly requiring evidence "that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution" (citation omitted)).

28

With respect to Evans's own overtime slips, any theory of willful blindness was utterly inapplicable because Evans could not credibly (and did not) disclaim factual knowledge of the circumstances of those submissions.  The government alleged an alternative theory of aiding and abetting liability in connection with Evans's signing of his subordinates' overtime slips.  *See* App:735.  But, even in this context, there was no evidence that Evans took deliberate steps to avoid knowledge of relevant facts.  *See United States v. Little*, 829 F.3d 1177, 1185 (10th Cir. 2016) ("We are not directed to any evidence in the record suggesting that [defendant] deliberately avoided knowledge of the firearms [found in his residence], and thus agree that the instruction was improper."); *cf. Azubike*, 564 F.3d at 67 (describing evidence that when someone else "began discussing the contents of the briefcase" defendant was carrying, "referring to it in coded language, defendant asked him to stop, saying, 'Don't say nothing more, don't say anything'"); *Brandon*, 17 F.3d at 452 (defendant in bank fraud case told one buyer "that he 'didn't want to know anything about'" second mortgage and, "[a]t other times, . . . gestured in a way that one buyer described as trying to say 'not in front of me'").  To the contrary, the government clearly proceeded on a theory that Evans had actual knowledge of fraud by his subordinates.  *See, e.g.*, App:706-07

29

("Imagine Captain Evans sitting at those CompStat meetings . . . while knowing

that his officers were submitting hundreds of false overtime slips . . . ."), 728

("They're doing it, he sees them doing it, and then joins in because it's easy to

do.").  While theories of willful blindness and actual knowledge may co-exist, that

is only so where "separate and distinct evidence supports a defendant's deliberate

avoidance of knowledge," unlike in the present case.  *Brandon*, 17 F.3d at 452

n.74.

Evans's mere failure to question consistent overtime practices that

indisputably pre- and post-dated his tenure in the ECU did not justify a willful

blindness instruction, notwithstanding government witnesses' disagreement with

those overtime practices.  For one thing, lay witness testimony regarding the

permissibility of the overtime submissions was inadmissible.  *See infra* pages 45-

49.  The requirements imposed by the CBA and BPD policies were, instead, legal

questions for the court.  Even setting that evidentiary issue aside, defense witnesses

testified to a contrary understanding of overtime requirements, consistent with

Evans's alleged actions.  *See* App:637-38 (former officer with 35 years' experience

testifying to her "understanding" that submission of overtime in "four-hour blocks"

was "the way that it was"), 670 (another former officer with 24 years' experience

testifying that submission of overtime in four-hour blocks "was just the standard practice of what we did").

In this context, Evans's inaction did not sufficiently support an inference that he "purposely contrived to avoid learning" relevant "facts in order to have a defense in the event of a subsequent prosecution." *Brandon*, 17 F.3d at 452 (citation omitted). The record is bereft of evidence of any "red flags" sufficient to require inquiry under this Court's willful blindness caselaw. *Cf. United States v. Epstein*, 426 F.3d 431, 441 (1st Cir. 2005) (despite receiving customer complaints, including that "the whole scheme was a scam," defendant "never inquired into how the appraisals were produced or who produced them; he merely showed up and signed the appraisals, spending only a few seconds on each one"); *United States v. Richardson*, 14 F.3d 666, 671 (1st Cir. 1994) ("For about eighteen months packages of jewelry were sent uninsured to defendant via Federal express" bearing "false names and addresses for the sender" and accompanied by "[n]o bills or invoices").

The erroneous willful blindness instruction was seriously prejudicial to Evans. At trial, the government repeatedly emphasized Evans's supervisory position in the ECU and suggested that he was responsible for failing to stop his

31

subordinates' alleged misconduct.  *See* App:128 (eliciting testimony from Mancini that "[s]upervisors and commanders are responsible for uncovering, knowing various misconduct that may be occurring with those under their command and those that they supervise."), 129 (asking Mancini to read exhibit stating that "[s]upervisors will be accountable for the foreseeable or prevent[a]ble illegal conduct of those employees under their assigned area of supervision or command"), 310 (asking Coppola to read from overtime slip, "It is the responsibility of the supervisor authorizing the overtime or the captain's designee, not the officer submitting the overtime slip, to enter the appropriate overtime code"), 527 (asking Lanchester to recite the same language).  In this context, the willful blindness instruction introduced an unnecessary risk that the jury would convict Evans for failing to learn of, and stop, illegal submissions by his subordinates.  It improperly lessened the government's burden to prove the *mens rea* required under the charging statutes, namely that Evans acted "intentionally," 18 U.S.C. §666(a)(1)(A), to "defraud," 18 U.S.C. §1343.  For the foregoing reasons, the government cannot prove that the error was harmless beyond a reasonable doubt, as required "[w]here a potentially erroneous instruction deals with an essential element of the crime."  *United States v. McLellan*, 959 F.3d 442,

446 (1st Cir. 2020) (citation omitted); *see also Little*, 829 F.3d at 1185 (applying "harmless beyond a reasonable doubt" standard (citation omitted)); *United States v. Barnhart*, 979 F.2d 647, 653 (8th Cir. 1992) (same).

## II.     THE EVIDENCE WAS INSUFFICIENT TO SATISFY §666'S REQUIREMENT THAT BPD RECEIVE FEDERAL "BENEFITS"

Evans moved for a judgment of acquittal at the close of the government's case. *See* App:631. The defense then called two witnesses, neither of whose testimony related in any respect to federal benefits flowing to the BPD. During the re-direct examination of the first defense witness, at a break in the proceedings, the district court "note[d] that the defendant's motion for judgment of acquittal [wa]s preserved," adding, "I will take that under advisement and await the jury's verdict as is consistent with the preference of the First Circuit for the jury to be given a chance to voice its view before the judge possibly intervenes in the case." App:656-57. The defense acknowledges that, ordinarily, a defendant's failure to renew a Rule 29 motion after presenting a defense case, which occurred here, would result in waiver and a heightened standard of review requiring a showing of "clear and gross injustice" to reverse the convictions. *United States v. Falcon-Nieves*, 79 F.4th 116, 124 (1st Cir. 2023) (citation omitted).

Here, however, the defense respectfully submits that the Court should

review the sufficiency of the evidence *de novo*, as it would a preserved claim. Appellate preservation requirements "embod[y] the policy that trial judges be given an opportunity" to take appropriate action to correct trial errors. *United States v. Chen*, 998 F.3d 1, 5 (1st Cir. 2021). In the unique circumstances of this case, where (a) the district judge, in the midst of the defense evidence, expressly stated his intent to rule on the motion after the jury verdict and (b) the defense evidence did not relate in any way to the sole offense element challenged on appeal, the motion at the close of the government's case provided ample opportunity for the court to address the issue and renewal of the motion would have been an empty formality.[3] Alternatively, the defense contends that the government's reliance upon evidence patently insufficient to satisfy this Court's binding construction of the charging statute constitutes a clear and gross injustice warranting reversal under any standard. *See Falcon-Nieves*, 79 F.4th at 124-26 (finding clear and gross injustice standard satisfied for claim of insufficient evidence to satisfy §666's jurisdictional element where the evidence "supportably

---

[3] The court's statement that it would consider the motion for judgment of acquittal post-verdict did not require Evans to lodge any additional motion at that point. *See United States v. Rivera-Ortiz*, 14 F.4th 91, 98-99 (1st Cir. 2021) (rejecting "the notion that a separate post-verdict motion under Rule 29(c) is required to avoid waiver even after the filing of a proper pre-verdict motion under Rule 29(a)").

show[ed] that [the impacted entity] received a gross amount of federal funding in excess of $10,000," but did not prove that the entity "received the *kind* of benefits specified in § 666(b)").

Section 666 requires that the "organization, government or agency" impacted by the charged offense "receive[d], in any one year period, benefits in excess of $10,000 under a Federal program . . . ." 18 U.S.C. §666(b). As this Court has made clear, "not all federal funds constitute 'benefits' under the statute." *United States v. Bravo-Fernandez*, 913 F.3d 244, 247 (1st Cir. 2019). Rather, "[t]o determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose." *Id.* (quoting *Fischer v. United States*, 529 U.S. 667, 681 (2000)). "The inquiry should examine," among other things, "the conditions under which the organization receives the federal payments." *Fische*r, 529 U.S. at 680-81 (holding that Medicare funds received by health care organizations constituted "benefits" because "[t]he structure and operation of the Medicare program reveal a comprehensive federal assistance enterprise aimed at ensuring the availability of quality health care for the broader community" and "[p]articipating health care organizations . . . must satisfy a series of qualification and accreditation

35

requirements, standards aimed in part at ensuring the provision of a certain quality

of care").

In *Bravo-Fernandez*, in order to satisfy this jurisdictional element, the

government relied on a stipulation that, during the relevant time, "the

Commonwealth of Puerto Rico received over $4.7 billion in federal *funds*." 913

F.3d at 248. This Court found that stipulation insufficient and reversed the

convictions. In doing so it observed:

> It is tempting to agree with the government here. As
> judges who hear cases arising out of federal benefit
> programs and who are familiar with how such programs
> are funded, we are certain that there are federal benefit
> programs that provide far more than $10,000 to the
> Commonwealth and its instrumentalities. The question
> remains, however, whether those programs are funded by
> the $4.7 billion in federal funds that go directly to the
> Commonwealth. Perhaps the federal benefit programs
> enjoyed in Puerto Rico are financed through other federal
> monies, leaving the $4.7 billion to be spent on
> infrastructure, salaries, and other expenditures that may
> or may not constitute 'benefits' under *Fischer*? In any
> event, we see nothing in the record that tells us whether
> any juror would certainly know the answer to these
> questions, nor did the government secure a stipulation
> supplying such answers.

*Id.* at 249-50.

The BPD finance director's testimony in the present case suffered from

precisely the same deficiency that this Court identified five years prior: she testified only to the department's receipt of federal "funds," not benefits. Unadorned testimony that the BPD received a "JAG equipment" grant, App:557, the only funding specifically tied to the one-year period at issue in the substantive §666 charge, said nothing about the purposes for and conditions under which BPD received the funds. *Cf. Fischer*, 529 U.S. at 680-81. The other two grants mentioned in the testimony were not tied to any one-year period, much less that specific one. The violence prevention grant was approximately $2.8 million received over a more than two-year period (October 2015 through December 2017). The Violence Against Women grant, which was described with slightly more specificity ("basically support[ing] the salary and fringe and any overtime for domestic violence advocates")[4] amounted to approximately $45,000 over 15 months (October 2015 through December 2016). None of the testimony satisfied "the government's burden to put forth evidence about the federal program's 'structure, operation, and purpose' in order to make ascertainable whether an entity received 'benefits' under § 666(b)." *Bravo-Fernandez*, 913 F.3d at 251 (citation omitted).

---

[4] *See* 18 U.S.C. §666(c) (excluding from scope of statute "bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business").

## III.   THE DISTRICT COURT COMMITTED PLAIN ERROR IN SEVERAL ASPECTS OF ITS JURY INSTRUCTIONS

Because these instructional errors were not raised at trial, this Court's review is for plain error.  *See United States v. Latorre-Cacho*, 874 F.3d 299, 303 (1st Cir. 2017).  Accordingly, Evans must show "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings."  *Id.* (citation omitted).  "The third prong of plain error review, that an error affects a defendant's substantial rights, generally requires the defendant to show a reasonable probability that, but for the error, the outcome of the proceeding would have been different."  *United States v. Canty*, 37 F.4th 775, 790 (1st Cir. 2022) (citation omitted).

### A.   Failure to Instruct regarding §666's Federal "Benefits" Requirement

Here, as in *Bravo-Fernandez* itself, "the district court stated that § 666 only required jurors to find that the [entity] received federal 'funds of more than $10,000.'  No instruction was given on what constitutes a benefit, and the word 'benefits' does not appear even once throughout the instructions."  913 F.3d at 248. This omission constituted clear and obvious error for reasons set forth *supra*

38

Section II.  Section 666's benefits requirement is an "essential element of the crime," *Bravo-Fernandez*, 913 F.3d at 251, which must, accordingly, be found by a jury beyond a reasonable doubt.  *See, e.g.*, *Hurst v. Florida*, 577 U.S. 92, 97 (2016).  This Court has discussed the benefits requirement as an issue to be decided by a jury.  *See Bravo-Fernandez*, 913 F.3d at 249 (rejecting government argument that the "jury, exercising common sense and relying on general knowledge, c[ould] reasonably infer that the federal funds constituted 'benefits'"); *United States v. Dubon-Otero*, 292 F.3d 1, 8 (1st Cir. 2002) ("When we apply *Fischer* to this case, we conclude, ***and the jury supportably could have so found***, that the Institute payments that Health Services received constituted benefits." (emphasis added)).[5]

---

[5] The defense acknowledges that other courts, including the Second Circuit, have reached the opposite conclusion and held, based in part on a misreading of *Dubon-Otero*, that "what constitutes a benefit [under §666(b) is] a legal question for the court" and "should not be resolved by the jury."  *United States v. Sullivan*, 118 F.4th 170, 199 & n.11 (2d Cir. 2024) (citation omitted).  The defense respectfully submits that this out-of-circuit authority is inconsistent with this Court's precedents and the bedrock constitutional rule that all offense elements must be found by the jury.  *See also, e.g.*, *United States v. McLean*, 802 F.3d 1228, 1246-47 (11th Cir. 2015) (observing that "this Court has held in a variety of contexts that, when a jurisdictional issue is inextricably entwined with a substantive element of a crime, the issue should be determined by a jury," and concluding accordingly, "if we were to address this issue, we would determine that the decision to classify assistance as a federal benefit was properly submitted to the jury").

There is a reasonable probability that a properly instructed jury would have acquitted Evans on the §666 counts given the paucity of evidence regarding the benefits element, thus satisfying the third and fourth elements of the plain error standard.  *See Canty*, 37 F.4th at 796.

### B.    Contradictory Good-Faith Instruction

"[G]ood faith is an absolute defense to a charge of . . . wire fraud."  *United States v. Dockray*, 943 F.2d 152, 155 (1st Cir. 1991).  The "intent to defraud" required for conviction is "essentially the opposite of good faith."  *Id.*  That is why this Court has held that "[a] separate instruction on good faith is not required . . . where the court adequately instructs on intent to defraud."  *United States v. Camuti*, 78 F.3d 738, 744 (1st Cir. 1996); *see also United States v. Abdelaziz*, 68 F.4th 1, 55 (1st Cir. 2023) (addressing good faith under §666).

Here, the district court's good-faith instruction included two clear and obvious errors.  First, the court instructed that good faith does not "negate a defendant's intent to deceive or defraud others."  App:752.  Good faith and intent to defraud are opposites and, contrary to the court's suggestion, cannot co-exist.  The court's instruction improperly conveyed that the jury could simultaneously find good faith and intent to defraud and, in that situation, it would be required to

40

convict.  Second, the district court was clearly wrong in stating that "a defendant's honest belief that his actions were proper ***may*** negate an intent to commit the crime of conspiracy."  App:752 (emphasis added).  "Acquittal is not optional upon a finding of good faith . . . ; it is mandatory because a finding of good faith precludes a finding of fraudulent intent."  *United States v. Cavin*, 39 F.3d 1299, 1310 (5th Cir. 1994); *see also Dockray*, 943 F.2d at 155 ("[G]ood faith is an absolute defense . . . .").

Given the closeness of this case, and the lack of overwhelming evidence regarding *mens rea*, *see infra* pages 56-58, the defense contends that these clear errors also satisfy the third and fourth prongs of the plain error standard.  The defense acknowledges that other portions of the good-faith instruction stated the law accurately.  *See* App:752 ("If you find that Mr. Evans believed in good faith that he was acting properly, even if he were mistaken in that belief, . . . there would be no crime.").  This, however, does not preclude the existence of a reasonable probability that the jury was misled by the erroneous portions of the instructions.  *See Latorre-Cacho*, 874 F.3d at 309 (finding plain error where "the potential for the jury to have been so misled [wa]s substantial, notwithstanding that there were portions of the instructions that described the relevant law without misstating it").

## C.    Failure to Instruct that Aiding and Abetting Liability Requires "Advance Knowledge" of the Circumstances Constituting the Offense

The Supreme Court has squarely held that aiding and abetting liability requires proof that the defendant had "advance knowledge" of "the circumstances constituting the charged offense." *Rosemond v. United States*, 572 U.S. 65, 77-78 (2014); *see also United States v. Encarnacion-Ruiz*, 787 F.3d 581, 588 (1st Cir. 2015). Advance knowledge requires that the defendant "know of the principal's plan to commit the underlying offense with sufficient anticipation to be able to attempt to alter that plan or, if unsuccessful, withdraw from the enterprise." *United States v. Fernandez-Jorge*, 894 F.3d 36, 52 (1st Cir. 2018) (citations omitted); *see also Ford*, 821 F.3d at 74 ("[T]he government need prove beyond a reasonable doubt that the putative aider and abettor knew the facts that make the principal's conduct criminal."). While *Rosemond* arose in the context of a "double-barreled crime," namely using or carrying a firearm while engaging in a violent or drug trafficking offense, "nothing about the Supreme Court's mens rea analysis limits its applicability to statutes requiring two distinct actions." *Encarnacion-Ruiz*, 787 F.3d at 591 (citing *Rosemond*'s acknowledgment that the Court had "previously employed this knowledge requirement in a variety of contexts, including aider and

abettor liability for mail fraud").

Here, crucially absent from the district court's aiding and abetting instructions was any explanation of, or even reference to, *Rosemond*'s advance knowledge requirement. In light of *Rosemond*, and this Court's subsequent precedents applying it, this erroneous omission was clear and obvious. *See also United States v. Prado*, 815 F.3d 93, 102 (2d Cir. 2016) (finding lack of advance knowledge instruction to be plain error). It also carried significant potential for prejudice. The government argued that the jury should convict Evans for "aiding and abetting" his subordinates' "theft and fraud" by signing their overtime slips. App:735. The omission of any advance knowledge requirement created a significant risk that the jury would convict Evans without making any finding as to whether he knew his subordinates' submissions were false before he signed them. This risk was heightened by the willful blindness instruction which, as discussed *supra* Section I, erroneously lessened the government's burden of proof regarding *mens rea* for aiding and abetting liability, as well as by the government's repeated suggestion that Evans was required to learn of and stop misconduct by those working under him. The defense submits that the foregoing satisfies the third and fourth prongs of the plain error standard.

The district court's instruction that the jury must find Evans "willfully associated himself in some way with the crime and willfully participated in it as he would in something he wished to bring about" was insufficient. App:755-56. Indeed, in *Rosemond* itself, the Court held that the aiding and abetting instruction was erroneous despite a "prefatory 'umbrella instruction' that to aid and abet a crime, a defendant must 'willfully and knowingly seek[] by some act to help make the crime succeed.'" 572 U.S. at 82 (citation omitted). Nor does the requirement that Evans "consciously shared the [principal's] knowledge of the underlying criminal act and intended to help him or her" suffice. App:756. The instruction, on its face, said nothing about the timing of Evans's knowledge, and the reference to the "underlying criminal act" was broad enough to include an *actus reus* (*i.e.*, submission of overtime slips) only later learned to have been committed with the requisite *mens rea*. *See Fernandez-Jorge*, 894 F.3d at 53 (finding insufficient instruction requiring that "defendants consciously shared the other person's knowledge of the crimes charged in the indictment, intended to help each other, and took part in the endeavor, seeking to make it succeed" because it was susceptible to an interpretation that did "not require the government to have proven that the aider and abettor shared the defendant's knowledge of the crime before or

44

even at the moment when he chose to lend his assistance").

## IV. THE DISTRICT COURT COMMITTED PLAIN ERROR BY PERMITTING EXTENSIVE IMPROPER LAY OPINION TESTIMONY

Because Evans did not object to the admission of this evidence at trial, this

Court's review is for plain error.  *See United States v. Vazquez-Rivera*, 665 F.3d

351, 357 (1st Cir. 2011).

Federal Rule of Evidence 701 requires that lay witness opinions be: "(a)

rationally based on the witness's perception; (b) helpful to clearly understanding

the witness's testimony or to determining a fact in issue; and (c) not based on

scientific, technical, or other specialized knowledge within the scope of Rule 702."

### A. Improper Legal Conclusions

Testimony regarding "questions of law is rarely admissible because such

testimony cannot properly assist the trier of fact."  *In re Zofran (Ondansetron)*

*Prod. Liab. Litig.*, 57 F.4th 327, 340 (1st Cir. 2023) (citation omitted).  "[I]n our

legal system, purely legal questions and instructions to the jury on the law to be

applied . . . [are] exclusively the domain of the judge."  *United States v.*

*Mikutowicz*, 365 F.3d 65, 73 n.4 (1st Cir. 2004) (citation omitted); *see also Nieves-*

*Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997) ("It is black-letter law

45

that [i]t is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." (citation omitted)).[6]

A lay witness may not, for example, testify to "the correct interpretation of a contract." *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001); *cf. N. Amer. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible." (citation omitted)); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge.  In neither case do we permit expert testimony." (citation omitted)).

The government in this case asked several witnesses, none of whom was shown to have any expertise whatsoever, to interpret the relevant provisions of the CBA.  Most problematically, the government repeatedly asked witnesses to adopt its own reading of the CBA, under which "voluntary overtime" was accrued hour-for-hour in 15-minute intervals.  *See* App:146 (asking Mancini whether, "section 3 [of the CBA], which controls how overtime is measured or accrued, what time

---

[6] The fact that the foregoing precedents dealt with purported expert testimony "does not significantly alter [the] argument" because "ultimate legal opinion" is "equally inadmissible under both Fed.R.Evid. 701 and 702."  *United States v. Newman*, 49 F.3d 1, 7 n.8 (1st Cir. 1995), *superseded on other grounds*.

intervals, whether it's a 15-minute interval or a four-hour minimum," applied "to voluntary overtime"), App:309, 312 (BPD payroll employee defining "extended shift or tour" as "[a]nything that takes place immediately following your tour of duty" and testifying that such overtime was based on "actual hours worked, but within 15 minutes"), App:529 (Lanchester defining "extended tour overtime" as "any overtime where you work past . . . your scheduled tour that you were working").

A similar analysis applies to witness interpretation of regulations. *See N. Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 468 (1st Cir. 1988) (affirming district court's conclusion that proffered expert's "testimony as to the 'legality' of specific conditions or the 'meaning' of particular regulations would not have assisted the trier of fact in any significant way"); *U.S. Aviation Underwriters, Inc. v. Pilatus Bus. Aircraft, Ltd.*, 582 F.3d 1131, 1151 (10th Cir. 2009) (finding error where "[n]othing about the regulation suggest[ed] explanation by an expert was required, and such testimony also violate[d] the rule against experts testifying as to the law governing the jury's deliberations."); *FAA v. Landy*, 705 F.2d 624, 632 (2d Cir. 1983) (affirming exclusion of testimony about "the meaning and applicability of" Federal Aviation Regulations).

47

The government asked these same non-expert witnesses to interpret BPD regulations in a manner suggesting that Evans violated them.  *See* App:175 (asking Mancini whether, if two officers who split a shift "both wrote down eight hours of service on their overtime slips," that would "be permissible or impermissible under [BPD] regulations"), 223 (asking Waggett, "is splitting a shift permitted under BPD rules and regulations?"), 477 (asking Nee, "Do you have any reason to believe the split shift in this way, working half the time and getting paid twice for the amount of work you're actually doing, is allowed by the [BPD]?").

Finally, Rule 701 is violated where witnesses are asked to characterize a defendant's conduct in "terms that demand an understanding of the nature and scope of the criminal law."  *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir. 1980).  This is because "[t]he witness, unfamiliar with the contours of the criminal law, may feel that the legal standard is either higher or lower than it really is.  If either event is true the jury may accord too much weight to such a legal conclusion."  *Id.*; *see also United States v. Wantuch*, 525 F.3d 505, 514 (7th Cir. 2008) (finding that a "conclusion as to the legality of [defendant's] conduct" was "unhelpful to the jury under Rule 701"); *United States v. Southers*, 583 F.2d 1302, 1306 (5th Cir. 1978) ("[B]ank officials were properly not permitted to give their

48

opinions on the question of intent to injure and defraud.").

The government repeatedly asked witnesses to opine on criminal-law concepts, such as theft.  *See* App:149 (asking Mancini "under what circumstances were" instances of overtime theft "handled as criminal investigations" and "[w]hat markers . . . indicated that they were criminal in nature"), 487 (asking Nee, "At any point when you're putting in for hours not actually worked and getting more money than you're entitled to, would you view that as theft?"), 478 (Q: "What do you call it when you get money that you're not entitled to get?"  A: "Stealing."). The foregoing testimony represented "[a]ttempts to introduce meaningless assertions . . . amount[ing] to little more than choosing up sides" such that exclusion under Rule 701 was "require[d]."  *Wantuch*, 525 F.3d at 514.  While the witnesses did not specifically characterize Evans's conduct in criminal-law terms, the jury could hardly escape the inference that the descriptors applied to Evans's undisputed submission of overtime in four-hour blocks.

In short, "[i]t [wa]s for the jury to evaluate the facts in the light of the applicable rules of law, and it [wa]s therefore erroneous for [several] witness[es] to state [their] opinion[s] on the law" applicable to the case.  *Marx*, 550 F.2d at 510.

49

### B.    Speculation regarding Evans's State of Mind

"Testimony regarding the inchoate state of mind of a defendant does not fall within the category of allowable opinion testimony by lay witnesses." *United States v. Brown*, 938 F.2d 1482, 1488 (1st Cir. 1991).  Such testimony, for one thing, fails to satisfy Rule 701's requirement that lay opinion be "rationally based on the witness's perception." *See United States v. Sotis*, 89 F.4th 862, 877 (11th Cir. 2023) ("[Witness's] testimony that he had never seen so much willfulness was improper because it purported to tell the jury about [defendant's] state of mind— something to which neither he nor any other witness could testify based on his rationally-based perception."); *Townson v. Wal-Mart Stores, Inc.*, 760 F. App'x 345, 348 (5th Cir. 2019) (unpublished) ("[T]estimony by the Wal-Mart auto department supervisor, automotive technician, and corporate representative regarding what Wal-Mart actually knew based on the conditions on the day of the accident was not based on their personal perceptions.").  Additionally, when the evidence relied upon by the witness is also before the jury, the jurors are "in as good a position as the witness[] to gauge" the defendant's "state of mind," such that the testimony is not "helpful" as required by Rule 701.  *United States v. Walker*, 665 F.3d 212, 229 (1st Cir. 2011); *see also Wantuch*, 525 F.3d at 514

50

("The jury was just as capable as [the witness] of inferring that [defendant] knew he was committing a crime, without [the witness] opining as to whether [defendant] was aware that his conduct was illegal."); *United States v. Henke*, 222 F.3d 633, 642 (9th Cir. 2000) ("[The witness] was simply asked about the Board's conclusion that the defendants 'must have known' about the scheme-a conclusion that went to the primary question for the jury. Because the jury was in a superior vantage point to decide this issue, [the witness's] testimony that the defendants must have known about the revenue scheme was not helpful."); *United States v. Anderskow*, 88 F.3d 245, 251 (3d Cir. 1996) ("We do not understand how a witness' subjective belief that a defendant 'must have known' is helpful to a factfinder that has before it the very circumstantial evidence upon which the subjective opinion is based."). Even more problematically, to the extent the basis for the witness's opinion is not already in evidence, it invites conviction based on facts not "before the jury." *Vazquez-Rivera*, 665 F.3d at 360. This situation leaves the jury with "no way of verifying [the witness's] inferences or of independently reaching its own interpretations." *United States v. Williams*, 827 F.3d 1134, 1157 (D.C. Cir. 2016) (citation omitted).

Here, the government repeatedly asked witnesses to speculate regarding

51

Evans's state of mind, with a patently inadequate basis in personal knowledge to support their opinions. *See, e.g.*, App:165 (asking Mancini, based on email exchange he was not involved in, whether Evans was "knowledgeable about BPD's rules and regulations . . . governing details"), App:232 (Waggett testifying that she "assumed [Evans] knew" about overtime practices despite "never" having "had a discussion with him about it"), App:511 (asking Nee, "Could you have gotten away with splitting your shifts and only working half the time if the supervisors didn't know it? . . . Similarly, when by 2015 and certainly the last year or so of Captain Evans' tenure when people are consistently leaving early . . . could you have gotten away with that if the supervisors also weren't in on it?"), 600 (asking Iannetti, "So are these examples that if there's a four-hour minimum, he knows to put in less than four hours?"). The foregoing speculative testimony was independently inadmissible because the jury was equally equipped to draw the government's proffered inferences on its own, without the government putting a thumb on the scale through improper opinion testimony.

### C.    Extensive Reliance on Leading Questions

Federal Rule of Evidence 611 provides, "Leading questions should not be used on direct examination except as necessary to develop the witness's

testimony."  District courts, of course, have discretion to permit leading questions

where necessary.  *See United States v. Greaux-Gomez*, 52 F.4th 426, 437-38 (1st

Cir. 2022) (affirming use of leading questions in examination of sexual assault

victim).

 Here, however, the government relied extensively on leading questions in

direct-examination of its own witnesses with no legitimate need to do so.  And

many of those leading questions related to the crucial issues discussed above

regarding interpretation of the CBA, the legality of the alleged conduct, and

Evans's state of mind.  *See* App:321 ("So in this instance Captain Richard Evans

himself is saying this is additional work and he, himself, is saying this is a 300

code that is paid on an extended tour 15-minute interval basis, correct?"), 487 ("At

any point when you're putting in for hours not actually worked and getting more

money than you're entitled to, would you view that as theft?"), 512 ("If you were

reporting hours in the way you did and only working half the time and getting paid

twice as much . . . under Captain Dowd, would that also have been wrong at that

time? . . . Would that also have been theft at that time? . . . In May 2021, before

you had any plea or cooperation agreement, when you met with the FBI and others,

did you tell them that not working the full 4:00 to 8:00 and putting that time in was

fraud?").

The government's heavy dependence on this improper manner of questioning built over time, culminating in its final witness, the FBI forensic accountant.  The government's questioning of that witness reads like a closing argument.  *See, e.g.*, App:586 ("[A]ll through August and September, time after time you see Captain Evans and others under his command putting in for four hours actually worked?"), 594 ("And so even if you credit someone all of the time and all of the overtime pay for every minute the building was even open, . . . Richard Evans was paid at least $17,000 when the building wasn't even open?"), 596 ("[T]here are 68 days where he certified that he worked from 4:00 to 8:00 p.m. and actual hours worked were four, correct?").[7]

### D.     Other Improper Testimony

The government's emphasis, through Mancini's testimony, *see supra* pages 19-20, of the importance of officer truthfulness was not relevant to any issue in this case and was therefore not "helpful" to the jury as required by Rule 701.  Rather, the predictable effect of such testimony, which included invocation of "the foundational principles of policing in a democratic society," App:128, was to

---

[7] The record is saturated with additional examples of leading questions.  *See, e.g.*, App:320, 387, 436, 449-50, 483, 488, 511, 574, 579, 593.

unfairly prejudice the jury against Evans. The same is true of generic

characterizations of Evans's alleged conduct as "wrong" or "bad." *See supra*

pages 12, 15-16.

### E. The Foregoing Testimony was Independently Inadmissible under Rule 403

Even assuming *arguendo*, and contrary to the argument *supra*, that the

foregoing evidence was admissible under Rule 701, any probative value it held was

"substantially outweighed" by the dangers of "unfair prejudice, confusing the

issues, [and] misleading the jury," such that the evidence should have been

excluded under Fed. R. Evid. 403. Permitting these non-expert witnesses to

repeatedly opine on legal issues, and Evans's state of mind, without a sufficient

basis for knowledge and in response to leading questions crafted to support the

government's theory of prosecution had significant potential to unfairly prejudice

Evans's defense. *See Wantuch*, 525 F.3d at 513 ("The considerations outlined in

Rule 403 also apply—lay opinions may be excluded if the opinion would be a

waste of time or its probative value is substantially outweighed by its prejudicial

nature."); *United States v. Wiggan*, 700 F.3d 1204, 1214 n.19 (9th Cir. 2012) ("The

lack of probative value is underscored by the fact that the opinion regarding

credibility was not particularly 'helpful to clearly understanding the witness's

55

testimony or to determining a fact in issue.'"); Fed. R. Evid. 704, advisory committee notes (citing Rule 403, among others, as "afford[ing] ample assurances against the admission of opinions which would merely tell the jury what result to reach").

### F. The Foregoing Improper Testimony Prejudiced Evans and Impacted the Fairness of the Proceedings

The proffered interpretation of the CBA underlying the government's prosecution of Evans was far from inevitable. Indeed, the CBA said nothing at all about purge overtime. And the CBA's only reference to overtime being paid on an hour-for-hour basis in 15-minute increments was in the context of "***duty requir[ing]*** an employee to work beyond the normal quitting time of his scheduled tour of duty." App:812 (emphasis added). There was evidence that purge overtime did not fit that description. It was scheduled in advance and offered on a voluntary basis, with officers having the ability to refuse. *See* App:272. Another section of the CBA expressly distinguished such voluntary overtime from a duty-required extended tour. *See* App:811 ("Employees other than those required to work beyond their normal tour of duty due to the exigencies of their workday (such as a late investigation, etc.) shall have the option of declining offered overtime."); *see also* App:139 (Mancini testifying, "Unless we're talking about an extended

56

tour where an officer remains past their normal quitting time to complete necessary administrative functions, much overtime is assigned in advance based on what used to be known as a low-man availability list.").

Ultimately, the government never convincingly established voluntary overtime as falling within section 3 of the CBA, the necessary predicate to its contention that it was required to be billed hour-for-hour in 15-minute increments. And, despite Evans working in the ECU with several different officers over the course of almost four years, the government presented no evidence of Evans's state of mind from anyone who communicated with him regarding overtime practices.

The potential persuasiveness of this defense argument is not merely hypothetical. Evans's successor as leader of the ECU, Timothy Torigian, *see* App:441, and three officers under his command, were acquitted of similar charges after a jury trial. *See United Staes v. Torigian*, No. 20-10164 (D. Mass. Apr. 27, 2023), Doc. 381 (Verdict). In the present case, the government apparently attempted to pre-empt the successful defense in *Torigian* by using witnesses to interpret the CBA in a manner inconsistent with that defense. This was clear error for the reasons set forth *supra*. And, in light of the *Torigian* verdict, there is, at the very least, a reasonable probability that the jury in this case would have

reached a different result had it not heard the improper opinion evidence.  The
potential for prejudice was further exacerbated by testimony characterizing
Evans's conduct as violative of BPD regulations, suggesting it amounted to theft or
stealing, and speculating about Evans's state of mind.  "Where such a likelihood of
conviction on" an improper basis exists, the Court is "compelled to find that the
fairness, integrity, and public reputation of the proceedings have been seriously
affected," satisfying the fourth and final prong of the plain error standard.  *Canty*,
37 F.4th at 796.

## V.    CUMULATIVE ERROR

Even should the Court conclude that none of the errors discussed above by
themselves were sufficiently prejudicial to warrant vacating Evans's convictions,
the Court should nonetheless vacate those convictions under the cumulative error
doctrine, which recognizes that "[i]ndividual errors, ***insufficient in themselves to
necessitate a new trial***, may *in the aggregate* have a more debilitating effect and
thus add up to prejudice."  *United States v. Baptiste*, 8 F.4th 30, 39 (1st Cir. 2021)
(citation omitted).  In assessing a claim of cumulative error, the Court looks to "the
nature and number of the errors committed; their interrelationship, if any, and
combined effect; how the district court dealt with the errors as they arose . . . ; and

the strength of the government's case." *United States v. Padilla-Galarza*, 990 F.3d 60, 85 (1st Cir. 2021) (citation omitted). "[W]hen there are both preserved and unpreserved errors," the Court should first consider the preserved errors "as a group under harmless-error review. If, cumulatively, they are not harmless, reversal is required. If, however, they are cumulatively harmless, the court should consider whether those preserved errors, when considered in conjunction with the unpreserved errors are sufficient to overcome the hurdles necessary to establish plain error." *United States v. Caraway*, 534 F.3d 1290, 1302 (10th Cir. 2008); *see also United States v. Pereira*, 848 F.3d 17, 30 (1st Cir. 2017).

Here, the defense contends that the many unpreserved instances of improper opinion testimony and several unpreserved instructional errors satisfy the plain error standard for reasons set forth *supra*. Even if the Court disagrees, those errors, in combination with each other and with the preserved error in giving a willful blindness instruction, affected Evans's substantial rights and implicated the fairness of these proceedings.

## CONCLUSION

For the foregoing reasons, Evans's convictions for federal programs theft and conspiracy to commit same should be reversed, and his remaining convictions

59

should be vacated.

Respectfully submitted,
Richard Evans
By his Attorneys,

/s/ **Michael Pabian**
Michael Pabian
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
pabianlaw38@gmail.com

/s/ **Martin G. Weinberg**
Martin G. Weinberg
20 Park Plaza, Suite 1000
Boston, Massachusetts 02116
(617) 227-3700 (Telephone)
(617) 338-9538 (Fax)
owlmgw@att.net

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1.      This document complies with Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), the document contains 13,000 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman, 14-point font.

**/s/ Michael Pabian**
Michael Pabian

Dated:  January 14, 2025

## CERTIFICATE OF SERVICE

I, Michael Pabian, hereby certify that on this 14th day of January 2025, this Brief was filed with the Court through its CM/ECF system, thus effectuating service on all parties to this appeal.

**/s/ Michael Pabian**
Michael Pabian

Dated: January 14, 2025

**TABLE OF CONTENTS**

**Caption**                                                                     **Page**

Judgment………………………………………………………………………...1

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | ) **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | ) |
| Richard Evans | ) Case Number: **1: 21 CR 10093** - **001** - **RGS** |
| | ) USM Number: 37153-509 |
| | ) Kevin J. Reddington |
| | ) Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
which was accepted by the court.

☑ was found guilty on count(s)   1, 2, 3, 4, 5, and 6
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Theft Concerning Programs Receiving Federal Funds. | 02/28/19 | 1 |
| 18 U.S.C. § 666 (a)(1)(A) | Theft Concerning Programs Receiving Federal Funds | 04/29/16 | 2 |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

10/24/2024
Date of Imposition of Judgment

/s/ Richard G. Stearns
Signature of Judge

The Honorable Richard G. Stearns
Judge, U.S. District Court
Name and Title of Judge

10/24/2024
Date

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 1A

Judgment—Page _____ 2 _____ of _____ 8 _____

DEFENDANT: Richard Evans
CASE NUMBER:  **1: 21 CR 10093   - 001 - RGS**

## ADDITIONAL COUNTS OF CONVICTION

| <u>Title & Section</u> | <u>Nature of Offense</u> | <u>Offense Ended</u> | <u>Count</u> |
|---|---|---|---|
| 18 U.S.C. § 1349 and | Conspiracy to Commit Wire Fraud | 02/28/19 | 3 |
| 18 U.S.C. § 1343 | | | |
| 18 U.S.C. § 1343 | Wire Fraud | 04/15/16 | 4 |
| 18 U.S.C. § 1343 | Wire Fraud | 04/15/16 | 5 |
| 18 U.S.C. § 1343 | Wire Fraud | 04/15/16 | 6 |

AO 245B (Rev.02/18)  Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT: Richard Evans
CASE NUMBER: 1: 21 CR 10093  - 001 - RGS

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

1 year and 1 day, as to each count to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:

The Court makes a judicial recommendation that the defendant be designated to an institution commensurate with security where the Bureau of Prisons can address any security concerns in light of the defendant's prior law enforcement service.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ before 2 p.m. on   1/6/2025 _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
                 Sheet 3 — Supervised Release

|  |  |  |
|---|---|---|
| Judgment—Page | 4 | of | 8 |

DEFENDANT:  Richard Evans
CASE NUMBER:  **1: 21  CR  10093  - 001 - RGS**

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :      2  year(s)  ▼

as to each count to be served concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

      ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Add0004

AO 245B (Rev. 02/18)   Judgment in a Criminal Case
              Sheet 3A — Supervised Release

| | Judgment—Page 5 of 8 |
|---|---|

DEFENDANT:  Richard Evans
CASE NUMBER:   1: 21 CR 10093  - 001 - RGS

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision.  These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so.  If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity.  If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10.  You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11.  You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12.  If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction.  The probation officer may contact the person and confirm that you have notified the person about the risk.
13.  You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____   Date  _____

Add0005

AO 245B(Rev. 02/18)   Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT:   Richard Evans
CASE NUMBER:   **1: 21 CR 10093  - 001 - RGS**

Judgment—Page _____ 6 _____ of _____ 8 _____

## SPECIAL CONDITIONS OF SUPERVISION

1. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.

2. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.

3. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

AO 245B (Rev. 02/18)    Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: Richard Evans
CASE NUMBER: 1: 21 CR 10093 - 001 - RGS

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|  | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 600.00 | $ | $ 15,000.00 | $ 154,249.20 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| Boston Police Department |  | $154,249.20 |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| TOTALS | $ 0.00 | $ 154,249.20 |  |

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☑ the interest requirement is waived for the    ☑ fine    ☑ restitution.

☐ the interest requirement for the    ☐ fine    ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Add0007

AO 245B (Rev. 02/18)  Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page  8  of  8

DEFENDANT:  Richard Evans
CASE NUMBER:  **1: 21  CR  10093  - 001 - RGS**

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A  ☑  Lump sum payment of $  600.00  due immediately, balance due

       ☐  not later than _____ , or
       ☑  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☑  F below; or

B  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

C  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

D  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☑  Special instructions regarding the payment of criminal monetary penalties:

       Payment of the restitution shall begin immediately and shall be made according to the requirements of the Federal Bureau of Prisons' Inmate Financial Responsibility Program while the defendant is incarcerated and according to a court-ordered repayment schedule during the term of supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☑  Joint and Several

       Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

       The defendant is personally responsible for $17,390.99 and that amount of restitution obligation shall not be affected by any restitution payments that may be made by other defendants charged separately for the instant offense. The remaining $136,858.21 shall be paid by the defendant jointly and severally with any other persons convicted of the instant offense but charged separately who is or may be ordered to pay restitution in this matter.

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

Add0008