UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>RICHARD EVANS, )<br>          Defendant )<br>) | No. 21-CR-10093-MJJ<br>Leave to File Granted on<br>February 19, 2026 |

### **DEFENDANT RICHARD EVANS'S SENTENCING MEMORANDUM**

Mr. Evans stands before the Court on remand for resentencing after the First Circuit Court of Appeals vacated his convictions for conspiracy to commit federal programs theft and federal programs theft but affirmed his convictions for conspiracy to commit wire fraud and wire fraud. At Mr. Evans's initial October 2024 sentencing, the Court (Stearns, J.) imposed an incarcerative sentence of one year and one day. The First Circuit remanded to this Court "for further proceedings consistent with [its] opinion," after vacating two of the six counts of conviction. *United States v. Evans*, 143 F.4th 1, 18 (1st Cir. 2025). The calculation of Mr. Evans's Guideline Sentencing Range ("GSR") as 41-51 months was not challenged by either party on appeal and therefore constitutes the law of the case. *See, e.g.*, *United States v. Wallace*, 573 F.3d 82, 90 (1st Cir. 2009). But this Court otherwise has "wide discretion in determining what factors to consider at resentencing." *United States v. Garcia*, 872 F.3d 52, 56 (1st Cir. 2017). Accordingly, as in all sentencing proceedings, this Court is tasked with imposing a punishment that is "sufficient, ***but not greater than necessary***" to serve the enumerated statutory goals. 18 U.S.C. § 3553(a) (emphasis added). Here, the defense respectfully requests that the

1

Court revise J. Stearns's prior sentencing determination and permit Mr. Evans to serve his sentence on home confinement,[1] which request is supported by a recently proposed amendment to the sentencing guidelines expanding the universe of offenders (to include Mr. Evans) for whom a sentence of home confinement will be authorized under the guidelines if the current proposal is made final and then not vacated or revised by Congress.[2]

Mr. Evans does not, in any respect, seek to depreciate or minimize the gravity of his offense of conviction. The defense does, however, seek via this Sentencing Memorandum to provide the Court with a full, three-dimensional understanding of the human being whose immediate future now rests in its hands.

### I.    Personal Background

Attached to this memorandum are 11 letters of support from family and friends which together bring into sharp focus the person now facing sentencing before the Court: a devoted husband and father, a conscientious and empathetic police officer, an active community member,

---

[1] It would not be unprecedented for one Judge of this Court to reduce another Judge's sentence after a First Circuit appeal in which some, but not all, of the defendant's convictions were vacated. In fact, just yesterday, J. Stearns reduced two defendants' sentences on remand from 30 months to 24 months and from 24 months to 15 months, respectively. *See United States v. Pullman et al.*, No. 19-CR-10345 (D. Mass.); U.S. Attorney's Office D. Mass. Press Release, *Former Union President and Former Lobbyist Sentenced for Stealing Union Funds and Lying to Federal Investigators* (Feb. 18, 2026), *available at* https://www.justice.gov/usao-ma/pr/former-union-president-and-former-lobbyist-sentenced-stealing-union-funds-and-lying; *see also United States v. O'Donovan*, No. 22-CR-10141 (D. Mass.) (sentence reduced from 24 months to 18 months after partially successful appeal).

[2] The proposed amendment is currently subject to an ongoing public comment period running until March 18, 2026. *See* Proposed Amendments to the Sentencing Guidelines at 1 (Jan. 30, 2026), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202602_rf-proposed.pdf. After considering any public comments, the Sentencing Commission will decide whether to adopt the amendment and, if so, submit it to Congress. The amendment would then take effect in 180 days, absent modification or disapproval by Congress. *See* 28 U.S.C. § 994(p).

and a dependable friend in times of need.  As detailed in these letters, Mr. Evans has, over time, demonstrated a consistent and innate character of honesty and compassion that most of us can only aspire to.  *See, e.g.*, Exhibit 3, Letter of Edward Bulman ("Rich is an exemplary person. . . . I would trust Rich with my life and the lives of my family. . . .  [H]e has lived his life with such a degree of unwavering decency, honesty, and integrity, that it is difficult to isolate one example out of the totality of his life."); Exhibit 4, Letter of Thomas Dwyer (friend of "more than fifty years" calling Mr. Evans "one of the most honest and trustworthy individuals in my life"); Exhibit 5, Letter of Robert Guarnotta ("Richie is a people person, treating everyone with respect and dignity, and looking out for the wants and needs of others."); Exhibit 6, Letter of Thomas Manning ("If ever one of my family members needed the help of a police officer, I'd want that police officer to be of the character such as Richard Evans.").

Mr. Evans is the son ready and willing to take in an elderly parent or in-law.  He is the father providing a consistent source of support to an adult child struggling with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  He was the police officer who respected and truly listened to the citizens he served, no matter their socioeconomic status.  He is the friend who will drop everything to attend to someone suffering from a serious health condition.  Independent of his participation in the events that led to his conviction which are addressed below, Mr. Evans is a defendant whose life story, good deeds, and past contributions to his community warrant consideration in the holistic determination of an appropriate sentence – one no greater than necessary to accomplish the objectives of federal sentencing.

Mr. Evans is 67 years old.  He was born in Boston, Massachusetts to Frank and Ruth Evans.  PSR ¶ 79.  He was one of five children.  PSR ¶ 80.  Mr. Evans recalls, "My childhood during the 60's and 70's in Dorchester were during a time of much turbulence in Boston.  The

Vietnam War era, busing in Boston, racial strife, the youth movement and the influx of drugs into the city, especially cocaine certainly tried the souls of many in our neighborhood. Many cho[]se the wrong path even though they were good at heart." Dkt. 142 (Defendant's letter to J. Stearns) at 1.

Mr. Evans rose above these circumstances with the help of his parents. Mr. Evans's father was a Navy Veteran of World War Two, who contracted rheumatic fever in the Philippines, causing heart problems the rest of his life. Dkt. 142 at 2. After the war Mr. Evans's father joined the Boston Police Department ("BPD"), but his career was cut short due to a serious traffic accident that Mr. Evans was too young to recall. *Id.* Mr. Evans's father "underwent three open heart surgeries in the 1970's." PSR ¶ 79. Mr. Evans was present when his father died of a heart attack "and attempted to revive [his father] by performing CPR," which was very traumatic to Mr. Evans. PSR ¶ 79; Dkt. 142 at 2. Mr. Evans's mother was also a Navy Veteran of World War Two, who became a homemaker. PSR ¶ 79; Dkt. 142 at 2. She passed away in 1990 from pancreatic cancer. PSR ¶ 79. All Mr. Evans's siblings have led productive lives with the values instilled in them by their parents. Dkt. 142 at 2-3.

From an early age, a friend of fifty years writes, "I have observed that Rich has always been even-handed and without guile in his interactions with people. He looks at situations with an analytical eye and would never allow bias or emotion to cloud his judg[]ment." Exhibit 3, Letter of Edward Bulman. Another friend recalls, "We faced many challenges together growing up in Dorchester and together we managed to avoid a lot of the pitfalls that many in our neighborhood fell into." Exhibit 5, Letter of Robert Guarnotta.

Mr. Evans's father's heart attacks, which contributed to his early retirement from the BPD, "left the family at risk financially. Richard worked two jobs while living at home and

attending Boston [C]ollege to obtain his degree." Exhibit 7, Letter of Frank Evans; *see also* Exhibit 5, Letter of Robert Guarnotta (Mr. Evans "put[] himself through Boston College while working many hours to pay for it").

When Mr. Evans met his wife of 34 years, Dorothy, he was a BPD cadet. Dorothy herself "has been employed with the [BPD] since 1977 and is the head clerk." PSR ¶ 81. Mr. Evans at the time struck Dorothy as "a very kind, serious, reserved and hardworking person." Exhibit 2, Letter of Dorothy Evans. When the two reconnected seven years later, Dorothy was again "impressed how dedicated [Mr. Evans] was to his parents, siblings and his career." Exhibit 2, Letter of Dorothy Evans.

Mr. Evans "was a great support to [his] parents, . . . help[ing] financially and with whatever [they] needed." Exhibit 7, Letter of Frank Evans. After Mr. Evans and his wife married, they "stayed to assist [Mr. Evans's] father who had a lot of health issues." Exhibit 2, Letter of Dorothy Evans.

Later, when Mr. Evans's children "were only 18 months and 4 years old," Mr. Evans's mother-in-law "sustained a head injury and subsequent stroke, followed by surgery and a long road of partial recovery. Due to the stroke she had a significant change in personality and her behavior became increasingly difficult." Exhibit 2, Letter of Dorothy Evans. Mr. Evans's wife writes, "Without his love, support and infinite patience under difficult circumstances I don't know how I could have gotten through it." Exhibit 2, Letter of Dorothy Evans. Mr. Evans's mother-in-law "lived with [Mr. Evans's family] when she could no longer live alone," ultimately passing away "[a]fter 10 years of suffering." Exhibit 2, Letter of Dorothy Evans.

Mr. Evans was, and continues to be, a highly involved father. *See* Exhibit 8, Letter of Eileen Billotte (describing Mr. Evans as a "loving father and husband who has worked tirelessly

to provide a stable and happy life for his loved ones"). His wife writes, "When our sons were growing up and involved with Scouting; while working nights [Mr. Evans] was able to participate in the Boy Scouts as a Leader and mentor for many years. He also coached baseball." Exhibit 2, Letter of Dorothy Evans.

Mr. Evans's son Russell is 34 years old, but still lives with Mr. Evans and his wife. ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████ According to Mr. Evans's wife, Mr. Evans "offers stability for Russell." PSR ¶ 81. ███████████████████████████████████████ █████████████████████████████████

While his family has always come first, Mr. Evans also worked hard to advance his career at the BPD. When Mr. Evans was just a child, his older brother recalls him "saying he wanted to be a police officer like [his] father brother and . . . uncles." Exhibit 9, Letter of Michael Evans; *see also* Exhibit 7, Letter of Frank Evans ("Richard loved and respected our father and decided to follow in his footsteps to become a Boston Police Officer.").

"Most of his career he worked evenings or nights in some of the busiest and most dangerous sections of the city. He studied diligently for many years to advance through the ranks. He also went back to school to get his Masters Degree to serve the citizens of the city of Boston to the best of his ability. He has worked in diverse communities in many capacities, as a patrolman, supervisor and as a Captain attended many Community meetings and special events." Exhibit 2, Letter of Dorothy Evans. One fellow officer recalls that, as young officers, he and Mr. Evans "patrolled the streets and three public housing developments in the South Boston

neighborhood." Exhibit 10, Letter of Mark Hayes. Another former colleague, whose family resided in Dorchester, recalled that his sisters "would get frustrated by the lack of police response when calling the 911 system for quality of life issues such as loud music and parking situations. . . . Out of the many [supervisors the officer's sister] talked to, only a handful would be helpful and empathize with her situation. One of those supervisors was Richard Evans." Exhibit 6, Letter of Thomas Manning.

Mr. Evans's record in 37 years with the BPD was "unblemished. Throughout his entire career, there were no complaints from fellow officers or supervisors under whom he served," nor were there any "civilian complaints lodged against him." Exhibit 4, Letter of Thomas Dwyer. Most importantly, Mr. Evans "always treated people with dignity and respect while serving as a police officer." Exhibit 2, Letter of Dorothy Evans; *see also* Exhibit 4, Letter of Thomas Dwyer ("[Mr. Evans] consistently treated people with civility and respect . . . ."). One fellow officer and friend writes that Mr. Evans "displayed integrity and common sense throughout his career. He was a hard and devoted worker; He was a team player who displayed compassion and empathy on a regular basis." Exhibit 11, Letter of George Billotte. When Mr. Evans "was promoted to Captain, the men and women under his command deeply respected him. He treated everyone fairly. He also displayed a strong sense of leadership and direction." Exhibit 11, Letter of George Billotte; *see also* Exhibit 10, Letter of Mark Hayes ("Throughout all my working experiences with Mr. Evans, I found him to be an exceptionally good police officer, supervisor, and commander. . . . I never observed Mr. Evans lose control or get angry with anyone, whether they were police officers or public citizens.").

Perhaps most tellingly, Mr. Evans's generosity has continued after his 2021 Indictment in this matter, and even after his October 2024 initial sentencing before J. Stearns. Mr. Evans's

7

brother recalls that, "in December 2023," he "got notice of divorce[] after 50 years." Exhibit 9, Letter of Michael Evans. The news "was devastating" and compounded by the fact that Mr. Evans's brother was undergoing radiation treatments for cancer and had to sell his home. Exhibit 9, Letter of Michael Evans. The home required "a lot of work." Exhibit 9, Letter of Michael Evans. Mr. Evans's brother recalls, "I had to jack up the house put columns underneath to support the house[.] Richard was there [to] repair termite infested seal beams and paint the house." Exhibit 9, Letter of Michael Evans; *see also* PSR ¶ 93a (noting that in the summer of 2024, Mr. Evans "spent every other day assisting [his brother] with clearing up 40 years of construction material and repairing the home for sale"). Even under the significant personal strain of federal indictment, Mr. Evans "was still there for [his brother] when [his brother] needed him." Exhibit 9, Letter of Michael Evans.

    Mr. Evans similarly proved "a loyal, kind and respectful" friend who remained at one longtime friend's "side even after his retirement from the force and throughout the last 5 years as he battled with a terminal disease." Exhibit 8, Letter of Eileen Billotte. Mr. Evans visited his friend (and former partner) "on a weekly basis and when [his friend] transitioned to hospice" in June 2025, Mr. Evans "went to visit him every other day." PSR ¶ 93a. The friend's wife writes, "Richie offered support throughout my husband's sickness and was there for him, for me, and for our family in his final days leading up to his passing. My family is eternally grateful that my husband was fortunate enough to have had a friend like Richie, who supported us and especially my husband during one of the most difficult times in our lives." Exhibit 8, Letter of Eileen Billotte.

    A Scoutmaster who volunteered with Mr. Evans describes him as "a model citizen. Each year, Richard is a key member of our Hanover Day Classic Car Show team held every June,

which raises money for our Hanover food pantry. . . . Recently, Richard assisted our Hanover American Legion in raising over $8,000 through one of our car show events." Exhibit 12, Letter of David Sawin; *see also* PSR ¶ 93a.

## II. A Sentence of Home Confinement Would Be Fair and Just Under 18 U.S.C. § 3553(a) Based on Mr. Evans's Personal History and Circumstances

Mr. Evans's total offense level has been calculated as 22, yielding a GSR of 41-51 months. As this Court is fully aware, Supreme Court and First Circuit precedents confer broad discretion to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008) (affirming "dramatic" downward variance under *Gall*).

a. *Proposed amendments to guidelines*

The defense notes at the outset that Mr. Evans's offense level would be decreased under proposed amendments to the sentencing guidelines, which have not yet been adopted. *See United States v. Kelly*, 99 F.4th 1018, 1027 (7th Cir. 2024) (affirming variance based on non-retroactive amendment to guidelines). More specifically, the alleged loss of more than $150,000 but less than $200,000 would result in an 8-level (not 10-level) enhancement under a proposed amendment to U.S.S.G. § 2B1.1. Proposed Amendments to the Sentencing Guidelines at 44 (Dec. 12, 2025), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf.

Even more importantly, another proposed amendment would authorize a sentence of home confinement for offenders with Mr. Evans's offense level and criminal history. Proposed Amendments to the Sentencing Guidelines (Jan. 30, 2026), *available at* https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-

9

amendments/202602_rf-proposed.pdf ("Proposed Amendments").  The amendment would add an introductory comment emphasizing that "non-imprisonment sentences undoubtedly serve a punitive function and in many cases would adequately serve the purposes of sentencing when appropriate conditions are imposed."  *Id.* at 6; *see also* S. Rep. No. 98-225 at 92 (1983) ("It may very often be that release on probation under conditions designed to fit the particular situation will adequately satisfy any appropriate deterrent or punitive purpose.").  The proposed amendment would additionally expand Zone B, within which a sentence of probation is explicitly authorized under the guidelines "provided that the minimum term of imprisonment specified in the guideline range is satisfied by a period of intermittent confinement, community confinement, or home detention,"[3] to include up to level 23 offenders within Criminal History Category I.  Proposed Amendments at 6, 12.

Mr. Evans is a level 22 offender in Criminal History Category I, such that the proposed amended guidelines would, if enacted, authorize a probationary sentence of home confinement.  Moreover, if his offense level were reduced by 2 levels for loss amount (which it would be under the other proposed amendment discussed *supra*) and another 2 levels for a first-time offense (which Mr. Evans is not eligible for since his sentence was enhanced under U.S.S.G. § 3B1.1, *see infra* at 11), he would be a total offense level 18, well within the proposed new Zone B of the sentencing table.  The defense submits that the Court can and should consider the policies underlying these proposed amendments in resentencing Mr. Evans.

---

[3] The defense acknowledges that the sentence imposed by J. Stearns was below the minimum term recommended by the guidelines, such that the proposed amended guideline would require a longer term of home confinement absent a variance.  However, the defense submits that J. Stearns correctly varied downward from the guideline range for all of the reasons set forth herein, and that Mr. Evans should not be penalized for bringing a partially successful appeal to the First Circuit.

10

b. *Specific and general deterrence*

Mr. Evans is a first-time offender, having never previously been convicted of, or even charged with, any other crime. From a sentencing perspective, this fact is of the utmost importance. As Judge Gertner noted in *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007), there is a "demonstrable difference in the recidivism rates of real first offenders as compared to other defendants in Criminal History Category I." *See also United States v. Aguilera*, No. 06-CR-336, 2008 WL 4830802, at *3 (E.D. Wis. Oct. 28, 2008) ("Statistically, the rate of recidivism for such defendants is quite low . . . ."). The Sentencing Commission, recognizing this fact, amended the guidelines to provide a two-level downward adjustment to defendants, like Mr. Evans, who have zero criminal history points. *See* U.S.S.G. § 4C1.1. However, because he received a sentencing enhancement under U.S.S.G. § 3B1.1, Mr. Evans has not benefitted from this downward adjustment. PSR, Response to Objection #10. Regardless of the specific guideline level, there is no need to subject Mr. Evans to incarceration in order to specifically deter him. Imposition of a prison term would also carry significant risks and burdens for Mr. Evans dissimilar to those of the average prisoner. Mr. Evans, who wore a law enforcement badge for most of his professional life, would be housed with federal felons likely to transfer their anger on to him. Further, since his arrest and release on bail nearly five years ago, Mr. Evans has engaged in no conduct that would provide a basis for a conclusion that specific deterrence is required.[4]

The goal of general deterrence similarly does not require a lengthy period of

---

[4] The defense respectfully requests that the Court Order Mr. Evans to serve only one year of supervised release given the length of time he has already been on pre-trial release without any indicia of risk.

incarceration. In short, no rational human being aware of what has occurred to Mr. Evans would ever knowingly and intentionally choose to endure what he has experienced over the last five years. Having spent decades of his life pursuing his childhood dream of building a career in the BPD and an unimpeachable reputation in his community, Mr. Evans has now lost much of what he has worked for. Mr. Evans describes this case has having "consumed his last five years," rendering him "unable to focus on anything" else. PSR ¶ 88. His wife similarly attests that "the instant offense and conviction," and the loss of Mr. Evans's dream job with the BPD, "has destroyed him." PSR ¶ 90. In more than 30 years of marriage, Mr. Evans's wife "has never seen [him] the way he is now, depressed and anxious, and she is worried about him." PSR ¶ 90. Mr. Evans has "had his face flashed on the news in the newspapers and on . . . multiple [TV] stations" and has "lost a job that he loved." Exhibit 9, Michael Evans.

 Additionally, in 2025, Mr. Evans has lost his pension, earned over "nearly four decades of public service," and was forced to "return[] to work at Home Depot so that he" and his family "could maintain some financial security." Exhibit 4, Letter of Thomas Dwyer. Mr. Evans's pension "would have earned approximately $120,000 yearly." PSR ¶ 100. In February 2025, an actuary estimated the value of the pension as $1.524 million. During his entire tenure in the Evidence Control Unit, which gave rise to his prosecution in this case, Mr. Evans collected approximately $108,000 in overtime pay, including legitimate overtime pay. PSR ¶ 49. Mr. Evans collected approximately $17,000 in overtime pay for time when the evidence warehouse was closed. PSR ¶ 47. Respectfully, losing a pension potentially worth $1.5 million dollars as a result of a $17,000 (or even $108,000) fraud is, in itself, a significant punishment, sufficient to

deter any rational offender.[5]

    c. *Family circumstances*

The defense additionally respectfully requests that the Court consider Mr. Evans's important role in supporting his family, most notably his son Russell. *See supra* at 6. A sentence of home confinement would serve to punish Mr. Evans, provide additional deterrence to other offenders (beyond the significant consequences Mr. Evans has already suffered), and at the same time ensure that Mr. Evans is able to continue supporting his son and other family members.

    d. *Circumstances of offense*

While Mr. Evans accepts the jury's verdict and responsibility for his offenses of conviction, a review of the circumstances of his offense provides context for his actions, which the Court can and should consider in imposing sentence.

In May 2012, Mr. Evans became Captain of the BPD's Evidence Control Unit ("ECU"), which is "responsible for maintaining evidence collected as part of BPD investigations, including storing and cataloging new evidence, retrieving evidence for use in court, and transporting evidence from various districts." PSR ¶¶ 21-22. "In or around 2011, the ECU ran out of space for new evidence. The BPD consequently approved a program called 'purge overtime,' which allowed ECU officers to work an overtime shift to 'purge' or dispose of old and unneeded

---

[5] The Court plainly has the ability to consider these collateral consequences in fashioning an appropriate sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (varying from guidelines to impose non-incarcerative sentence "in part because of a number of statutory and regulatory collateral consequences [the defendant] will face as a convicted felon").

evidence, organize the evidence at the warehouse more efficiently, scan older evidence into newer computer systems so that it can be tracked more effectively, and thereby create space for the intake of new evidence." PSR ¶ 23. "This purge overtime was generally performed on Mondays through Thursdays and was typically available to officers from 4 p.m. to 8 p.m. on those days (following the end of the regular 7:30 a.m. to 4 p.m. shift)." PSR ¶ 24.

The government alleged at trial that "every purge overtime shift was paid (or supposed to be paid) on an hour-for-hour basis, in 15-minute increments." PSR ¶ 33. However, ECU officers including Mr. Evans submitted purge overtime slips in 4-hour blocks, when they had in fact worked less than four hours. *Id.* This practice began "almost as soon as the purge overtime program began in approximately 2011," before Mr. Evans's transfer to the ECU. PSR ¶ 35. The same practice continued after Mr. Evans left the ECU. PSR ¶ 44 n.1.

Mr. Evans's tenure in the ECU represented a significant change from his prior 29 years at the BPD. "It was a support unit not dealing with the emergency nature of the line function." Exhibit 1, Letter of Richard Evans.

While Mr. Evans participated in the overtime practices at the ECU, which the jury found constituted a fraud, those practices indisputably did not originate with him. PSR ¶ 35. One fellow BPD officer writes, "What Mr. Evans did was a well-accepted policy, practice, and procedure within the [BPD] during my entire 37-year career." Exhibit 10, Letter of Mark Hayes; *see also* Exhibit 6, Letter of Thomas Manning ("The police department handled overtime and paid details situations in four hour blocks of time, sometimes requiring four hour minimum pay. People throughout the department had conflicting opinions about when it was appropriate or

14

not.").[6] As the same fellow officer opines, "[t]hat is the background and working environment under which Mr. Evans worked. It is not an excuse for Mr. Evans's conduct, but . . . offer[ed] . . . to clarify what occurred in the [BPD]." Exhibit 10, Letter of Mark Hayes.

### III.     Conclusion

For the greater part of seven decades, Mr. Evans did everything right. He worked hard to rise above his humble beginnings and pursue his dream of becoming a BPD officer. He proved himself over decades to be a consistently supportive family member and friend, while at the same time demonstrating an impressive level of responsiveness and empathy towards the citizens he served in his work at the BPD. Here, Mr. Evans has been prosecuted and convicted for his continuing the pre-existing practice of submitting for purge overtime at the ECU in 4-hour blocks. Mr. Evans deeply regrets this decision, for which he has paid dearly, including through the loss of his dream job and a pension worth $1.5 million dollars. Mr. Evans's offense, though, should not completely outweigh a lifetime of hard work and overall decency. For these reasons, and to advance the policies underlying the recently proposed amendments to the sentencing guidelines, the defense respectfully requests that the Court permit Mr. Evans to serve his sentence on home confinement.[7]

Respectfully Submitted,<br>
RICHARD EVANS<br>
By His Attorney,

---

[6] There was trial evidence that, "subject to two well-known and well-defined exceptions that d[id] not apply here," namely court overtime and recall overtime, "overtime accrue[d] in 15-minute intervals rounded up to the next 15-minutes, and employees [we]re only paid for their actual hours worked." PSR ¶ 25. But, as the attached letters demonstrate, that was not a universal consensus view within the BPD.

[7] If the Court instead intends to impose any incarcerative sentence, the defense requests that the Court allow Mr. Evans to self-report to his designated place of incarceration.

/s/ Martin G. Weinberg
Martin G. Weinberg, Esq.
Mass. Bar No. 519480
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
owlmgw@att.net

Dated: February 19, 2026

**CERTIFICATE OF SERVICE**

I, Martin G. Weinberg, hereby certify that on this date, February 19, 2026, a copy of the foregoing document has been served via email on the government.

/s/ Martin G. Weinberg
Martin G. Weinberg, Esq.