UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RICHARD EVANS | No. 21-cr-10093-MJJ |

### I. SENTENCING MEMORANDUM OF THE UNITED STATES

Richard Evans faces resentencing after the First Circuit affirmed his convictions for wire fraud and conspiracy to commit wire fraud—four counts for which Evans was previously sentenced to a year and a day in prison on each count, to be served concurrently. At his resentencing, this Court should reimpose the same sentence that the trial court imposed on these counts after listening to the evidence in detail and after being especially well-versed in the nature and circumstances of the crime and the defendant's history and characteristics.

Evans committed these crimes while he was a public servant who held a position of trust as a Captain in the Boston Police Department and while he served as the commanding officer of the BPD's Evidence Control Unit. As the jury found, Evans and those under his command engaged in a lengthy fraud scheme by routinely submitting false pay slips so that they could receive money that they were not entitled to receive by getting paid for work that they simply did not do. Evans was no passive participant in this scheme—over *multiple years* and on *hundreds (if not thousands) of occasions*, Evans falsely certified time slips that he knew were false so that he and other BPD officers could get paid overtime for countless hours when they were not working at all.

1

As the government highlighted at the original sentencing—and as the original sentencing judge (Stearns, D.J.), agreed when imposing the original sentence—the fact that the defendant spent his career as a police officer and has undoubtedly done good things in his life mitigates, but certainly does not eliminate, the need for just punishment, promoting respect for the law, and deterrence. For the reasons below and those to be articulated at the sentencing hearing, the defendant should be sentenced again to a year and a day in custody, to be served concurrently on all counts (same as the prior sentences for counts 3-6); a term of 2 years of supervised release to be served concurrently on all counts (same as the prior sentences for counts 3-6); and a fine of $15,000 (same as the prior sentence).

The government strongly rejects the notion that the defendant should not be sentenced to prison time. The § 3553(a) factors such as the nature and circumstances of the crime, the defendant's history and background, and the need to reflect the seriousness of the offense, promote respect for the law, provide for general deterrence, and avoid unwarranted disparities all support the government's recommendation.

What follows below are excerpts and arguments taken from the sentencing memorandum that the government filed in connection with the original sentencing, revised and cleaned up to reflect the current status of the case, the government's current recommendation, and the 18 U.S.C. § 3553(a) factors that merit highlighting at this stage. Based on the arguments below and those to be advanced at the hearing, the resentencing court should impose the same sentence imposed by the trial judge who oversaw the trial. The defendant does not deserve an even greater break than he has already received, and a failure to impose a period of incarceration on a high-ranking police officer who engages in egregious fraud, theft, and corruption would send a terrible message.

I.  **The Guideline Calculations and Related Sentencing Factors.**

The revised presentence report ("PSR") again calculates the defendant's guideline range as 41-51 months. *See* PSR, ¶ 103.

Although there is no dispute about the guidelines on resentencing, the government highlights certain aspects of the guideline calculations to help the resentencing court better understand the other § 3553(a) factors, including the nature and circumstances of the crime and the defendant's history and background.

   A.  **The Proposed Sentence is a Significant Downward Variance**

As a starting point, it is worth reflecting on the guideline range of 41-51 months because it highlights the significant benefit the defendant has already received/will be receiving if this court sentences him to a year and a day in custody.  That is an *over 70% downward variance* for a defendant convicted at trial for being a high-ranking public official who engaged in theft/fraud and who helped oversee a large group of police officers engaging in theft/fraud.

As the government intends to highlight at the sentencing hearing, it is not the case that the sentencing court ignored mitigating factors such as the defendant's age, health, career as a police officer, family situation, or collateral consequences.  That is precisely why the sentencing court gave him over a 70% downward variance in imposing the sentence of a year and a day.  Anything further is not supported by the record or the 3553(a) factors.

   B.  **The Defendant Benefited from Extremely Conservative Guideline Calculations.**

The resentencing court should further know that not only was the original sentence of a year and a day already an over 70% downward variance from the guidelines of 41-51

3

months, but the guidelines as calculated were based on an extremely conservative estimate that has already benefited the defendant significantly.

The PSR calculates the defendant's base offense level as 7 (*see* PSR, ¶ 61), with a specific offense level increase of 10 levels based on a loss of $150,000 to $250,000 (*see* PSR, ¶ 62). In reaching this conclusion, the Probation Office was very conservative in its approach and viewed facts in a light very favorable to the defendant—given its sentencing recommendation, the government does not wish to litigate the loss amount, but the government notes that this loss amount is lower than what the government calculated in its offense conduct, and indeed, is artificially low based on the *defendant getting a pass for years of theft and fraud where the economic loss caused by the conspiracy is not possible to calculate with certainty*.

At trial, the evidence—which included both voluminous data (years and years of overtime slips, payment data, and alarm records) and summary records—showed that one attempt at calculating the loss showed that the loss attributable to this scheme exceeded $420,000. *See* PSR, ¶ 47. This calculation showed that *during the period of the charged conspiracy*, over $420,000 was paid out in overtime pay to police officers who claimed to be working at the evidence warehouse *during the time the evidence warehouse was closed*. But even that calculation understates the loss and harm here, and some additional comments on the italicized portions of the prior sentence warrant mentioning.

*First*, as the evidence at trial showed and as the PSR notes, "based on alarm records alone, the overtime theft and fraud by Evans and his coconspirators exceeded $420,000." PSR, ¶ 48. Despite that acknowledgement, the PSR only holds Evans responsible for a loss of $150,000 to $250,000. Under conspiracy law principles, the government could easily have pushed for a loss exceeding $250,000.

4

*Second*, the PSR takes the view that Evans should only be accountable for the loss during the time when he was Captain of the ECU and only when the building was closed. That, of course, necessarily understates the loss. The evidence at trial showed that the overtime fraud scheme perpetrated by Evans and his subordinates was institutionalized and became a near-daily occurrence once Evans was in charge. There were countless instances where most officers left early (and then fraudulently billed), although the Evidence Warehouse remained open until the last officer left. *Evans has not been held responsible for any of that loss.* If the building was open because at least one person was in the building, even if everyone else left early and fraudulently billed (and plenty of people left early on nearly a daily basis and did exactly that), none of that loss was accounted for in the loss calculations for Evans.[1]

*Third*, having institutionalized this pattern of fraud with all the Sergeants and Patrol Officers at ECU between 2012 and 2016, there is a colorable argument that Evans should also bear some accountability for when these same Sergeants and Patrol Officers continued their fraud once Evans left the ECU. It was reasonably foreseeable to Evans that officers under his command—especially in a hierarchical system as the Police Department—would continue the fraud scheme he helped institutionalize. The

---

[1] This was a practical consideration that showed the bare minimum loss, not the actual loss. Investigators could not go back in time and figure out which officers left early and fraudulently billed on which days across multiple years. Officers testified that at least some subset did that nearly every day and thousands of hours were overbilled in this way. The one thing technology did allow for is for investigators to go back and figure out when the alarm records showed that the last person left and alarmed the building. Accordingly, at sentencing, the government only calculated the loss—in an extremely conservative way—to be the period when the entire building was closed. The defendant got a pass for countless officers under his command on countless days leaving early and fraudulently billing. If Evans or anyone under his command committed theft/fraud when the building was open, Evans got away with it for sentencing purposes.

government did not seek to hold Evans responsible for any of that, which he arguably should also be responsible for under conspiracy law principles.

*Fourth*, and perhaps most importantly given the evidence at trial, Evans is significantly benefiting by only being held responsible for loss based on alarm records because this method of calculation does *not* hold him responsible for any loss during the years during which Evans and members of the ECU participated in the "split shift" scheme. As the PSR acknowledges:

> Based on alarm records alone, *the overtime theft and fraud by Evans and his coconspirators exceeded $420,000*. Notably, that *calculation significantly understates the amount of the theft or fraud* because of the "split shift" scheme that was put in place during the early years of Evans. Under the split shift scheme, because some officers worked the first half from 4 to 6 p.m. and others worked from 6 p.m. to 8 p.m. (and they all then falsely claimed that they worked from 4 to 8 p.m.), *the alarm records do not reveal the scope of the fraud because the split shift allowed ECU officers to make it appear as if someone was present the entire shift*. Because one or more officers worked the later "split" and closed the building at or near 8 p.m., the alarm records show the building as only being closed at 8 p.m. and are insufficient to show when officers left early or showed up late but still falsely claimed 4 hours of actual hours worked. Thus, *for the multiple years when testimony incontrovertibly showed that officers were splitting shifts, the chart above does not capture the loss because the alarm records would show the building was closed at or near 8 p.m., even though the evidence makes clear that approximately half the time during those shifts was being falsely certified* and falsely claimed for payment.

PSR, ¶ 48 (emphasis added). Based on the testimony of Joseph Nee and other evidence at trial, Evans and those in the ECU employed this "split shift" scheme for *years*, and "regularly" employed this practice in 2012, 2013, and 2014. *See* Nee Testimony, Day 3 Tr. at 108:6-17; 112:21-113:23. *See also* PSR, ¶ 37 (quoting trial testimony from Nee, where he was asked, "From 2012 to approximately 2016, when Captain Evans was in charge, was there ever a time you remember consistently doing four-hour shifts?" Answer: "No."). The split shift practice that began in 2012 did not stop until some point in 2015, when a

new computer system meant that the officers could not easily split their shifts because some of them had difficulty picking up the new system, which resulted in everyone just working together for a few hours before going home and all falsely billing for four hours every day. *Id.* at 114:5-115:24.

What this means is that *for multiple years starting in 2012, even though there is incontrovertible evidence that officers were splitting shifts and then falsely certifying slips so that they could get paid for hundreds of hours not actually worked, there is no loss being attributable to Evans* because the split shift scheme prevented the alarm records from revealing the specifics of the fraud. Evans is essentially getting a "free pass" as to the loss amount for *approximately three out of the four years he led the ECU* because the alarm records cannot identify exactly when people went home after doing half a shift.

Given all the above, the loss calculation of $150,000 to $250,000 *dramatically understates* the loss attributable to Evans. Importantly for present purposes, what this also means is that the guidelines generally understate the nature and circumstances of the crime, and despite that, Evans received (and the government is now recommending that he again receive) a sentence that would be a significant downward variance. Nothing below the year and a day previously imposed is warranted here.

### C. The Sentence Should Account for Fact That the Defendant Abused a Position of Trust.

The PSR also correctly applies a two-level enhancement for abuse of a position of trust. *See* PSR, ¶ 65. As the PSR succinctly put it in its summary paragraph applying this enhancement, "the defendant was a Captain in the Boston Police Department, a position of both public and private trust, and he used this position to facilitate the commission of

7

the instant offense." *Id.* The evidence at trial made clear that this scheme could not have succeeded without the commanding officer being part of the scheme, and Evans used his position as the supervisor of the ECU to play a critical role in this scheme. Not only did he personally benefit from this theft and fraud, but he also personally signed off on thousands of pay slips over years where he knew officers were seeking pay for hours they did not work.

Every day of trial involved testimony from witnesses who showed different ways in which Evans abused his position to commit or get away with committing this theft and fraud. Lower ranking officers testified that they could not have gotten away with the scheme if Evans was not in on it. Ed Callahan, the Bureau Chief, testified that he trusted Evans and delegated various levels of authority to him—trust that Evans abused when helping his entire unit commit theft and fraud.

Notably, a critical part of this scheme—and some of the most damaging evidence at trial about the knowledge, intent, and state of mind of the defendant—was Evans deliberately misleading the Command Staff at the BPD about the purge program while he was simultaneously allowing (and joining) those who worked the purge program to engage in a massive overbilling and fraud scheme. The resentencing court does not have the benefit the trial court did, but the government highlights just one example that came up at trial that show not just fraud/theft by Evans, but significant misdirection, lies, and corruption. On June 24, 2015, Evans emailed his Bureau Chief, Ed Callahan, describing how "labor intensive" the purge process was becoming due to the new computer system, how "everything is taking twice or three times the usual time to process evidence," how "purge will be slowing dramatically because of this," and "because this system is more labor intensive across the board, I am requesting increased personnel be assigned to this

unit." (Trial Ex. 40). The same day that Evans claimed to his supervisor how labor intensive and slow the process was and how more personnel were needed, the alarm records showed that the Warehouse was closed and alarmed by 5:49 p.m., and the payroll records showed that Evans himself and four officers under his command submitted overtime slips certifying that they worked from 4 to 8 p.m. and their "Actual Hours Worked" were 4 hours. PSR, ¶ 42.

Evans participated in the fraud; Evans oversaw and supervised the fraud by those below him; and Evans helped cover up the fraud to those above him. Evans abused not just his position of trust as a police officer—but within the Boston Police Department, Evans abused his position of trust as a leader and Captain—to commit and get away with committing his crimes.

### D. The Sentence Should Account for Fact That the Defendant Held a Leadership Position.

Lastly, the enhancement for the defendant's role in the offense as a manager or supervisor of the criminal activity merits mention. *See* PSR, ¶ 64. Evans was a Captain—the highest civil service rank in the BPD—and the Commanding Officer of the ECU for approximately 4 years. Recognizing this title and role is important given the evidence at trial about BPD being a "paramilitary" structure. The junior officers needed Evans for the scheme to continue, and the evidence strongly suggests that if their leader had ever asked them to stop, there would have been no pushback from lower-level officers trained to follow the command of their superior officers. The testimony of Captain Wayne Lanchester, who was brought in to clean up the issues at the ECU, provides a stark contrast because it shows how *years of overtime fraud and theft* stopped instantly when the leader and commanding officer of the ECU began doing things the right way.

| | | |
|---|---|---|
| Q. | | Was there any pushback on that? |
| A. | | No. |
| Q. | | Did officers ever come up to you and say, "Captain, what do you mean this is how we're going to do it," or whatever else, anything like that? |
| A. | | No. |
| ... | | |
| Q. | | Did anyone ever come up to you and say, "Captain, people have been leaving early. We think that's okay. We should be allowed to leave early." Did anyone ever say that to you? |
| A. | | No. |

Lanchester Testimony, Day 3 Tr., 168:8-169:6.

This widespread scheme of fraud and theft could have been stopped by Evans at any time. And importantly, this widespread scheme of fraud and theft could not have occurred if not for the participation and explicit approval of Evans. Notably, the importance of the leadership role of the Captain was quite literally written into the protocols designed by the Boston Police Department to ensure that overtime was being paid properly. The overtime slip (Trial Ex. 8), on the back, literally states, "It is the responsibility of the supervisor authorizing the overtime or the captain's designee, not the officer submitting the overtime slip, to enter the appropriate overtime code." Further, "as the commanding officer, Evans had a nearly daily opportunity to observe and sign off on the overtime practices and payment requests of the ECU officers under his command." PSR, ¶ 28.

For the commanding officer of the Evidence Control Unit—inherently a position of significant trust given that all evidence for the entire city was entrusted to this team—to not be sentenced to any time in prison for participating in and supervising an extensive scheme of fraud and theft would be unjust and an insufficient acknowledgment of the harm caused here.

## II. Other Reasons Why the Government's Recommended Sentence is Appropriate and Supported by the 18 U.S.C. § 3553(a) Factors.

The 18 U.S.C. § 3553(a) factors strongly support the government's recommended sentence. Much of the discussion above—especially about the theft of public funds, the defendant's abuse of his position of trust, and his leadership and participation in the charged offenses—touches on various 3553(a) factors such as the "nature and circumstances of the offense," the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and the need "to afford adequate deterrence to criminal conduct." The government incorporates its discussion above without repeating those arguments, but a few additional points about the 3553(a) factors mention highlighting.

### A. The Nature and Circumstances of the Offense are Deeply Troubling And Call For A Meaningful Sentence.

At its core, this is a case about Evans (and his co-conspirators) violating the public trust and violating their duties as members of law enforcement to essentially commit theft from the public treasury. Evans presided over *multiple years* of systemic and widespread fraud. The fact that the defendant held the highest civil service rank in the Boston Police Department and had decades of experience, training, and knowledge only enhances the betrayal of the trust that the public and the BPD put in officers like Evans.

Evans was not just some idle participant in the scheme. He committed years of fraud himself by fraudulently certifying his own slips so he could get paid for countless hours of work he simply did not do. (Again, the government highlights that the loss calculation does not even hold Evans or others to account for approximately three out of the four years when Evans was in the ECU because the "split shift" scheme prevents the alarm records from revealing the full scope and nature of the overtime fraud.)

11

In addition to himself getting paid for work he did not do, Evans helped approximately a dozen other police officers under his command commit years of fraud by fraudulently certifying their slips so that they could also get paid for work they did not do. This likely resulted in some non-monetary benefits to Evans as well, as it allowed him to completely shirk his command responsibility and avoid any of the interpersonal issues that may have arisen if he had tried to stop a large criminal conspiracy amongst his officers. Instead, Evans willingly joined the criminal conspiracy and led it for years, helping institutionalize it and then taking a leading role in misleading the Command Staff about the nature of the purge program.

The court's sentence on remand should convey not just to Evans but to the public at large what the trial court's original sentence did—this is *not* a case about filling out some paperwork incorrectly or violating some internal BPD policy. This is a case about *years of overtime theft* that allowed *police officers* to *fraudulently obtain money from the public treasury* that they were not entitled to obtain because they *got paid for hundreds and hundreds of hours of work that they did not do*. The period of incarceration imposed by the trial court conveys that point. The period of incarceration recommended by the government on remand conveys that point. The lack of incarceration imposed by the defense on remand does not.

### B. The History and Characteristics of the Defendant Support the Government's Recommended Sentence.

The history and characteristics of the defendant also support the government's recommended sentence because the government's recommendation is measured and is based on careful consideration of both aggravating and mitigating factors (as opposed to the defense recommendation, which appears to be based just on the mitigating factors).

To be sure, the defendant's history and his current circumstances contain various mitigating factors. The government has always recognized the defendant's lengthy and distinguished career in the BPD, and the government has never portrayed the defendant as someone who was always corrupt or someone who was always looking to steal from the job. On the contrary, at trial, the government itself highlighted much of the defendant's experience and accomplishments. But the defendant's career must be viewed in context.

The defendant cannot simultaneously take credit for that lengthy career as a police officer while failing to acknowledge the most basic parts of his training and experience—knowing the difference between right and wrong; knowing he needed to fill out his time slips properly; knowing that he should not falsify police forms, and especially not thousands of times; knowing that police officers are public servants, not people entitled to steal from the public treasury.

There also remains significant tension between what the defendant wants this Court to believe about himself but what he then argues in his sentencing advocacy to try to minimize his sentencing exposure. This is a defendant who proudly talks about his time at the BPD, but then repeatedly argued at trial and at his original sentencing, and still appears to argue in some part now, that pretty much every officer in the BPD is corrupt because they were all committing fraud and stealing overtime pay like he was. *See, e.g.*, Defense Memo at pp. 13-14.

Evans insists on doing this to downplay the circumstances of his crimes even when his own experience belies the claim that this is how things have been done by everyone for decades. This is a defendant who claimed at trial (through arguments by counsel throughout trial) that he did not know how to fill out overtime forms properly and did not understand how overtime got paid. Not only did the testimony of other officers lay waste

13

to that claim, but so did the defendant's own pay forms. Based on the defendant's arguments at trial, the government went back through prior years to show the jury how the defendant—*prior to his time in the ECU*—filled out forms properly and honestly reported less than 4 hours when he worked less than 4 hours. The government also showed how *after his time in the ECU*, when he was no longer surrounded by corrupt officers, he went back to honestly reporting his actual hours worked, instead of just putting in 4 hours of overtime every shift regardless of how little he worked. What Evans did was not even his own well-accepted policy, practice, and procedure throughout his career, let alone the well-accepted policy, practice, and procedure through the Boston Police Department. This court need not decide that factual issue at resentencing—the jury decided that issue at trial when it soundly rejected the "everyone was doing it" defense.

### C.    The Need to Promote Respect for The Law and Deterrence.

The need to promote respect for the law and afford adequate deterrence are especially important factors for this Court to consider in a case sentencing a high-ranking police officer for a years-long conspiracy to commit theft and fraud.

A violation of the laws against theft and fraud may strongly suggest that even an average citizen who has stolen and helped others steal hundreds of thousands of dollars from his employer should be given a meaningful sentence of incarceration. That is especially true when the defendant is not some average citizen but a police officer who has sworn to uphold the law; the employer is not some private company but the police department of our largest city; and the harm is not limited to a private entity but the money being stolen is taxpayer funds. A just punishment is needed to promote respect for the law, and the need for punishment is further highlighted by the defendant's leadership role in the conspiracy, his abuse of the public trust, his lack of contrition and failure to

14

appreciate the wrongfulness of his conduct, and the pervasive nature of the theft and fraud.

The government submits to the resentencing court—like it did to the original sentencing court—that the Court should focus more in this case on general deterrence, not specific deterrence. Given the defendant's age and his removal from the Boston Police Department, the government does not believe that this defendant is likely to reoffend. Even if he does not reoffend—and the government assumes he will not, or the government would be recommending a higher sentence—he must be appropriately sentenced for the crimes he did commit, and a message must be sent to other officers who may be inclined to steal or commit fraud.

Notably, the need for adequate punishment, the need to promote respect for the law, and the need to afford adequate deterrence are all heightened because of how pervasive the fraud was. Contrary to what Evans tried to claim at trial, the fact that so many at the Boston Police Department were engaging in overtime fraud is not a *defense* to the crime—it is an *aggravating factor* that highlights the need for general deterrence. The argument that the Boston Police Department has a culture of overbilling overtime— even if accepted at face value—only heightens the need to appropriately deter others. The Court's sentence should help disabuse officers of the notion that stealing overtime pay is part and parcel of being a police officer.

Further, the government notes that the very structure of the Boston Police Department makes it very difficult for any individual officer to stand up and say the practice of lying or overbilling is wrong. As the evidence showed, the BPD had numerous policies and directives from the Commissioner that were insufficient to prevent or deter this crime. And as the testimony revealed, any line officer trying to stand up and challenge

this practice would risk transfer or retaliation. *See* Nee Testimony, Day 3 Tr., 124:17-20 ("Q: Why did you not speak up? A: I was afraid of getting, you know, launched to a different district or transferred out of that unit."). It has taken an outside investigation to shine a spotlight on this behavior that, when exposed to sunlight, does not withstand even a modicum of independent scrutiny. Common sense dictates that a public servant cannot, day after day, falsify police forms so that he can work for 2 hours, bill for 4 hours, and because he gets paid 1.5 times for overtime, get paid for 6 hours. Day after day, week after week, month after month, and year after year, Evans literally and figuratively signed off on that practice.

As the original sentencing court did after listening to all the trial evidence, the resentencing court should take this opportunity on remand to send a message to the defendant (provide just punishment), to others in the Boston Police Department (promote general deterrence), and to the public at large (promote respect for the law) that lying on police forms and stealing hundreds of thousands of taxpayer dollars is not acceptable and will be appropriately punished.

The defendant's request for a non-incarcerative sentence—a request he also made at the original sentencing and that was properly denied—would make a mockery of the law, not promote respect for the law, not provide just punishment, and not adequately deter others from committing the conduct that was unearthed in this case.

### D. The Need to Avoid Unwarranted Sentencing Disparities.

The government's sentencing recommendation is also designed to avoid unwarranted sentencing disparities. Two data points may be especially instructive for the resentencing court:

*First*, Officer Diana Lopez was charged in a related case (20-cr-10164) with participating in the same scheme. She was a subordinate of Evans and worked under him. She was sentenced to six months in custody. Her sentence supports the government's recommendation. Unlike Evans, she was a line officer and not a commanding officer. Unlike Evans, she pled guilty and entered into a cooperation agreement with the government and testified at trial. Unlike Evans, she was not a leader or organizer. Unlike Evans, she did not sign off on the false slips of others or help mislead commanding officers about this scheme. And she received *six months in custody*. Having her commanding officer not serve at least a year in prison would be deeply unfair.

*Second*, similar to the overtime fraud scheme at the Boston Police Department, officers at the Mass. State Police engaged in a widespread overtime fraud scheme during many of the same years. Two of those troopers (William Robertson and Daniel Griffin) were convicted at trial. Just recently, the First Circuit affirmed their convictions and sentences (except for a minor forfeiture issue). *See United States v. Robertson and Griffin*, 162 F.4th 209 (1st Cir. Dec. 19, 2025). The scheme involved a scheme where troopers would only work for a few hours but would then falsify their overtime pay records so that they could get paid for hundreds of hours of overtime that they did not work. The scheme, in many material respects, was similar to the scheme undertaken by Evans and his BPD co-conspirators. Griffin and Robertson were the only two officers who refused to accept responsibility and went to trial. Like Evans, Griffin was the commanding officer of the unit engaging in this lengthy overtime theft and fraud. Griffin was sentenced to *60 months in custody*. Robertson was sentenced to *36 months in custody*. Anything less than the one year and a day sentence for Evans would be deeply unfair and unwarranted.

### III. Brief Comments on Other Defense Arguments

The government comments briefly on some other issues raised by the defense or likely to be part of the arguments at the sentencing hearing:

*First*, the government notes that the vacated counts did not reduce the culpability of the defendant's core conduct. On appeal, the First Circuit ruled that there was insufficient evidence adduced at trial on the jurisdictional element of the 18 U.S.C. § 666 counts to show that the Boston Police Department received more than $10,000 in federal funds for purposes of the federal programs count. *See generally United States v. Evans*, 143 F.4th 1 (1st Cir. 2025). In other words, Evans committed theft and fraud, but the First Circuit was skeptical that there was sufficient evidence that Evans committed theft and fraud from an entity receiving $10,000 in federal funds. Putting aside the fact that if the government had chosen to retry those counts, there would have been sufficient evidence to prove the $10,000 jurisdictional limit, the core conduct by Evans was not at issue. He *did* commit theft and fraud. The *exact same conduct* was the basis for the convictions on counts 3-6 (wire fraud and conspiracy), and those counts were affirmed. The core conduct that resulted in the prior sentence was affirmed and remains true, and the same sentence should be reimposed.

*Second*, the government notes that the vacated counts did not reduce the defendant's guideline range. The defense argues that just last week, Judge Stearns reduced a sentence on remand from 30 months to 24 months, and from 24 months to 15 months, respectively. *See* Defense Memo, p. 1 (citing to *United States v. Pullman et al.*), 19-cr-10345. The undersigned AUSA has consulted with the AUSA assigned to that case to understand the nature of that resentencing, and that case is inapposite. In that case, the guideline ranges of the defendants changed on remand, and both defendants received

18

the benefit of the new zero-point offender guideline. The trial judge gave a certain downward variance (based on factors such as age and health conditions). On remand, the resentencing judge gave similar variances from the newly calculated guidelines. Here, the guidelines for Evans remain the same and his leadership role makes him ineligible for the new zero-point offender guideline. This court should impose the same sentence the trial judge did based on the same guideline that still applies.

*Third,* the defense makes arguments based on the language or reasoning of proposed guidelines that are simply not in effect right now and are still going through the comment period. As shown above, Evans has already benefited significantly from the guidelines actually in place (which still understate his criminality) and he has received significant breaks from his actual guideline range (an over 70% downward variance from a conservative guideline range); Evans does not deserve even bigger breaks from guidelines not yet in place or from a speculative guideline range.

### IV.   The Government Does Not Oppose Self-Surrender in this Case.

For the reasons above and those to be advanced at the sentencing hearing, the government believes the court should impose a sentence of a year and a day in custody. The government does not oppose the defendant being allowed to self-surrender to the BOP facility where he is designated. The original sentencing court also allowed for self-surrender, and the government does not have concerns about risk of flight.

                                                                     Respectfully submitted,

                                                                     LEAH B. FOLEY
                                                                     United States Attorney

                                              By: /s/ Kunal Pasricha
                                                     KUNAL PASRICHA
                                                     Assistant United States Attorney
                                                     District of Massachusetts